167 F.3d 1228
 99 Cal. Daily Op. Serv. 1118, 1999 Daily
Journal D.A.R. 1391
Alonso Antonio BARAHONA-GOMEZ; Carmen Victoria Vazquez De
Barahona; Alonso Antonio Barahona-Vasquez; Brenda Verzosa;
Dino Verzosa; Humberto Javier-Rivas; Bosco Guillermo
Rivas; Carole Beltran; Santiago Ramon Sequeira; Graciela
De Los Angeles Isariuz; Sandra Los Angeles Sequeira; Marta
Aguilar, Plaintiffs-Appellees,
v.
Janet RENO, Attorney General; Executive Office for
Immigration Review; Michael Creppy, Chief
Immigration Judge; Paul Schmidt,
Chairman of the Board of
Immigration Appeals,
Defendants-Appellants.
Alonso Antonio Barahona-Gomez; Carmen Victoria Vazquez De
Barahona; Alonso Antonio Barahona-Vasquez; Brenda Verzosa;
Dino Verzosa; Humberto Javier-Rivas; Bosco Guillermo
Rivas; Carole Beltran; Santiago Ramon Sequeira; Graciela
De Los Angeles Isariuz; Sandra Los Angeles Sequeira; Marta
Aguilar, Plaintiffs-Appellees
v.
Janet Reno, Attorney General; Executive Office for
Immigration Review; Michael Creppy, Chief
Immigration Judge; Paul Schmidt,
Chairman of the Board of
Immigration Appeals,
Defendants-Appellants.
 Nos. 97-15952, 97-17156.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 8, 1998.
Decided Feb. 11, 1999.
 
 Michelle Gluck, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the defendants-appellants.
 Marc Van Der Hout, Zachary Nightingale, Van Der Hout & Brigagliano, San Francisco, California; Robert Jobe, Law Offices of Robert Jobe, San Francisco, California; Don Ungar, San Francisco, California; Linton Joaquin, National Immigration Law Center, Los Angeles, California; and Robert Rubin, San Francisco, Lawyers' Committee, San Francisco, California, for the plaintiffs-appellees.
 Appeals from the United States District Court for the Northern District of California Claudia Wilken, District Judge, Presiding. D.C. No. CV-97-00895-CW.
 Before CYNTHIA HOLCOMB HALL and SIDNEY R. THOMAS, Circuit Judges, and ROBERT H. WHALEY,[1] District Judge.
 THOMAS, Circuit Judge:
 
 
 1
 In this appeal, we consider the propriety of a preliminary injunction enjoining enforcement of an amendment to the Immigration and Naturalization Act ("INA") which (1) imposes a 4,000 person annual limitation on the number of suspensions of deportation and adjustments of status that the Attorney General may grant in each fiscal year, and (2) provides that a person's accumulation of time towards the continuous physical presence requirement for suspension of deportation ends when he or she is served with a notice to appear. We conclude that the district court had jurisdiction to enter the injunction and its issuance was not an abuse of discretion. We affirm the district court's notice and bond requirements, but remand in light of the passage of the Nicaraguan Adjustment and Central American Relief Act.
 
 I.
 
 2
 The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104-208, 110 Stat. 3009 (1996), as amended by Act of Oct. 11, 1996, Pub.L. No. 104-302, 110 Stat. 3656, made a number of organic changes to immigration law. This appeal concerns the confluence of two of them: (1) a new absolute annual limitation on the number of deportation suspensions the Attorney General can issue, and (2) the termination of time an applicant can accrue toward the seven year continuous physical presence requirement for suspension upon receipt of an Immigration and Naturalization Service ("INS") notice to appear. Prior to the passage of IIRIRA, individuals who received a discretionary suspension of deportation were eligible to receive an adjustment of status to lawful permanent resident. There was no limit on the number of persons who could receive a discretionary suspension and adjustment of status; the decision was left solely to immigration judges across the country and panels of the Board of Immigration Appeals ("BIA"). See INA § 244(a), 8 U.S.C. § 1254(a) (1994) (repealed). IIRIRA § 309(c)(7) altered this, establishing a new absolute limitation of 4,000 deportation suspensions and adjustments of status that the Attorney General can make in a fiscal year.[2]
 
 
 3
 Under IIRIRA as it applies to the plaintiffs under prior law, an individual is not eligible for suspension of deportation in most circumstances unless he or she has been physically continuously present in the United States for seven years. IIRIRA § 309(c)(5) fundamentally altered this by terminating an individual's accumulation of time toward the continuous physical presence requirement when that person was served with an INS notice to appear or when the alien commits certain offenses that render him inadmissible or deportable, whichever comes first.[3]
 
 
 4
 IIRIRA was signed into law on September 30, 1996, with the 4,000 annual limit provided in IIRIRA § 309(c)(7) scheduled to become effective on April 1, 1997. The new provisions placing new restrictions on the continuous physical presence requirement also became effective April 1, 1997. See Astrero v. INS, 104 F.3d 264, 266 (9th Cir.1996). Thus, after April 1, 1997, some persons who had satisfied the continuous physical presence requirement were no longer eligible for suspension of deportation because the time period was calculated differently, and would probably never regain their eligibility because they could no longer accrue time to be credited against the requirement. Further, imposition of the annual deportation suspension limit meant that many applicants in the administrative pipeline who would have received suspensions under pre-IIRIRA law, would not after April 1, 1997 because of the change in law.
 
 
 5
 As of February 11, 1997, the Executive Office for Immigration Review had granted approximately 3,900 applications for suspension of deportation and adjustment of status under § 309(c)(7) for the fiscal year beginning October 1, 1996. Concerned by the April 1 effective date for imposition of the 4,000 annual limitation, Board of Immigration Appeals Chairman Paul Schmidt and Chief Immigration Judge Michael Creppy issued directives ordering a halt to the granting of any more suspensions of deportation. Judge Creppy ordered all immigration judges to:
 
 
 6
 reserve decision in any case in which you intend to grant suspension of deportation. Decisions denying suspension of deportation may be issued; however, you are directed not to issue any decisions granting suspension until further notice. If in fact this is the only reason you are reserving decision you may advise the respondent that decision is reserved for the purpose of determining the availability of a number consistent with 240A(e) of the statute.
 
 
 7
 In a similar letter to members of the BIA, Chairman Schmidt stated:
 
 
 8
 [U]ntil further notice, please do not process any appeals which might result in the grant of suspension of deportation.... This is a temporary measure to maintain the status quo until definitive guidance is provided by the Attorney General's office.... In practical terms, the Board attorney and paralegal staff should not process any suspension appeals other than those which, upon initial review, would appear to result in the clear denial of relief.
 
 
 9
 The Attorney General was required to promulgate regulations implementing IIRIRA by March 1, 1997,[4] but she failed to do so. Thus, on March 14, 1997, the plaintiffs[5] sought injunctive relief against the deferral of their cases. On March 21, 1997, the district court granted a Temporary Restraining Order, finding that there is "a serious question as to whether the Chief Immigration Judge and the Chairman of the Board exceeded their authority in issuing the directives." The court further found that:
 
 
 10
 Plaintiffs have shown that the balance of hardships tips sharply in their favor. If Defendants refuse to adjudicate Plaintiffs' applications for suspension of deportation because of the Creppy and Schmidt directives, Plaintiffs will most likely be deported. Although they are currently eligible for suspension for deportation, Plaintiffs will no longer be eligible after April 1, 1997. Deportation will inflict severe and, at least in the case of one Plaintiff, even life-threatening, harm on Plaintiffs.
 
 
 11
 The court held a hearing on the motion for a preliminary injunction on March 27, 1997, and one day later issued a preliminary injunction and provisional class certification. The injunction stayed the deportation of all class members who may be ordered deported after being denied suspension of deportation based on IIRIRA § 309(c)(5). The court found that an injunction was necessary to prevent mass deportations before the aliens could obtain judicial review. The certified class consists of aliens who have had favorable administrative determinations; that is, either the BIA or an immigration judge has determined that they qualify for a suspension of deportation, but the final adjudication has not yet occurred. The court also required the plaintiffs to post a nominal bond of $1,000 pursuant to Fed.R.Civ.P. 65(c) in the event that the government is found to have been wrongly enjoined.
 
 
 12
 After IIRIRA became fully effective on April 1, 1997, the defendants moved to vacate the preliminary injunction arguing that the district court had lost subject matter jurisdiction pursuant to new INA § 242(g), codified at 8 U.S.C. § 1252(g). The court denied defendants' motion, holding that INA § 242(g) was not intended to remove district court jurisdiction over procedural claims arising outside of deportation proceedings for which there is no other judicial review. Defendants immediately appealed the denial.
 
 
 13
 The court modified the preliminary injunction on September 17, 1997, requiring defendants to provide notice to class members when their applications for suspension of deportation are denied under IIRIRA § 309(c)(5). The court also found that the named plaintiffs were required to exhaust their administrative and judicial remedies, but general class members were not. Defendants also appealed this preliminary injunction order. We sua sponte consolidated both appeals.
 
 II
 
 14
 Defendants argue that as of April 1, 1997, the district court lost subject matter jurisdiction pursuant to INA § 242(g), (codified at 8 U.S.C. § 1252(g) (Supp. II 1996)), which provides:
 
 
 15
 Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.
 
 
 16
 Interpretation of this section in the context of this action would provide an interesting question if it were one of first impression in this circuit, but it is not. While the consolidated appeals were pending, Walters v. Reno, 145 F.3d 1032 (9th Cir.1998), petition for cert. filed, 67 U.S.L.W. 3337 (U.S. Nov. 3, 1998) (No. 98-730), was decided. Walters involved a class action filed against the INS alleging a denial of due process by inadequate notice of deportation procedures. The suit sought injunctive relief, which the district court granted. On appeal, the government cited 8 U.S.C. § 1252(g) [INA § 242(g) ] and, as it has in this case, challenged the district court's subject matter jurisdiction. In rejecting this argument, the court wrote:
 
 
 17
 By its terms, the statutory provision relied upon by the government does not prevent the district court from exercising jurisdiction over the plaintiffs' due process claims. Those claims do not arise from a "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien," but instead constitute "general collateral challenges to unconstitutional practices and policies used by the agency." McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 492, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991).
 
 
 18
 145 F.3d at 1052 (footnote omitted).
 
 
 19
 Like the class in Walters, the certified class in this case seeks injunctive relief staying deportation pending resolution of their constitutional claims. Like the class in Walters, "this is not a case in which the plaintiffs have asserted a constitutional challenge in order to conceal the true nature of their claims." Id. As in Walters, the objective of plaintiffs in this case "was not to obtain judicial review of the merits of their INS proceedings, but rather to enforce their constitutional rights to due process in the context of those proceedings." Id. The government's primary jurisdictional argument in Walters, as here, is that "the district court did not have jurisdiction to order any relief that interferes with its attempt to execute deportation orders against the class members." Id. Walters specifically rejected this contention and held jurisdiction proper.
 
 
 20
 Accordingly, because there is no principled distinction to be made between this case and Walters on this issue, the defendants' jurisdictional arguments are precluded and we cannot consider them.[6]
 
 III
 
 21
 Having resolved the district court's jurisdiction, we consider the preliminary injunction order on its merits. An order granting a preliminary injunction may be reversed only if the district court abused its discretion, made an error of law, or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. San Antonio Community Hosp. v. Southern Cal. Dist. Council of Carpenters, 125 F.3d 1230, 1233 (9th Cir.1997). We review issues of law underlying the preliminary injunction de novo. Id.
 
 
 22
 The traditional equitable criteria for granting preliminary injunctive relief are: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury to the plaintiffs if injunctive relief is not granted; (3) a balance of hardships favoring the plaintiffs; and (4) advancement of the public interest. Los Angeles Memorial Coliseum Commission v. National Football League, 634 F.2d 1197, 1200 (9th Cir.1980). A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment. Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir.1984). "In this circuit, the moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." Los Angeles Memorial Coliseum Commission, 634 F.2d at 1201.
 
 
 23
 The district court concluded that the plaintiffs raised serious questions as to whether IIRIRA § 309(c)(7) limits the number of suspensions of deportation unaccompanied by adjustment of status, and whether the directives were properly issued. Although we express no view on the ultimate disposition of these issues, we can readily agree that the district court did not abuse its discretion in determining that a sufficiently serious question existed that justified the entry of a preliminary injunction.
 
 
 24
 First, there is a legitimate question concerning whether issuance of the directives violated the Administrative Procedures Act. "When a federal agency issues a directive concerning the future exercise of its discretionary power, for purposes of APA section 553, its directive will either constitute a substantive rule, for which notice-and-comment procedures are required, or a general statement of policy, for which they are not." Mada-Luna v. Fitzpatrick, 813 F.2d 1006, 1013 (9th Cir.1987). Except in specified circumstances, an agency cannot promulgate a rule without first following the APA's notice and comment procedures. Section 553 of the APA specifically exempts "general statements of policy" from these procedures, as well as "rules of agency organization, procedure or practice." Determining whether a directive is a substantive rule or a general policy requires the reviewing court to examine the amount of discretion retained by the recipients of the directive. See Mada-Luna, 813 F.2d at 1013-14. The Creppy and Schmidt directives were purportedly temporary and internal, but they did not leave any real discretion to the BIA board members or the immigration judges. Whether or not the directives constituted rules requiring notice and comment, or merely general policy statements, is a question requiring further examination by the district court. However, the issue is "sufficiently serious" that we can conclude the district court did not abuse its discretion in entering a preliminary injunction.
 
 
 25
 Second, even if the directives were properly issued, adherence to them may have violated due process under United States ex. rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), by interfering with the independent judgment of the BIA in a suspension case. In deciding cases, the BIA is required "to exercise its own judgment when considering appeals." Id. at 266, 74 S.Ct. 499. Because of the directives, no applicant received a suspension grant between February 13, 1997 and October 3, 1997, when the Attorney General issued a regulation allowing conditional grants contingent upon the availability of a number. Over 3,000 decisions were withheld as a result of the directives. See 62 Fed.Reg. 51760 (Oct. 3, 1997). Plaintiffs contend this violated due process under Accardi; defendants claim that this was a temporary suspension of the adjudicatory process, without due process implications. We cannot, and do not, resolve this dispute. However, it also suffices as a "sufficiently serious question" to warrant the entry of a preliminary injunction.
 
 
 26
 Third, the regulatory authority of Chairman Schmidt and Chief Judge Creppy does not include the power to interfere with the adjudicatory process. Nothing in the governing regulations grants either the BIA Chair or the Chief Immigration Judge the power to withhold a decision, or to compel others to do so. At best, the regulations would appear to grant only internal supervisory authority. See 8 C.F.R. § 3.1(a)(2) ("The Chairman [of the BIA] shall direct, supervise, and establish internal operating procedures and policies of the Board"); 8 C.F.R. § 3.9 (duties of the Chief Immigration Judge include establishment of operational policy). The issue of whether the directives were issued within regulatory authority remains.
 
 
 27
 Fourth, there is a serious question of statutory interpretation. Plaintiffs contend that the language in IIRIRA § 309(c)(7) does not actually impose a restriction on the number of deportation suspensions because the section limits the Attorney General to granting 4,000 suspensions of deportation and adjustments of status to permanent residence. Plaintiffs note that status adjustment does not necessarily follow deportation suspension. Thus, plaintiffs argue that if Congress intended to limit only the number of suspensions, it could have plainly done so. Drawing significance from the use of the conjunction, plaintiffs claim that a statutory construction limiting suspensions would render the phrase "and adjustments of status to permanent residence" meaningless. Furthermore, they contend that new INA § 240A(b), 8 U.S.C. § 1229b(b)(3) (1998), can arguably be read as establishing two separate actions.
 
 
 28
 The government adamantly rejects this attempt to separate suspensions of deportation from adjustment of status. Defendants contend that adjustment has historically followed a grant of a suspension of deportation in the past. Indeed, the now-repealed INA section governing this procedure provided for adjustment following cancellation of deportation. See INA § 244, 8 U.S.C. § 1254 (1994) (repealed) ("Upon cancellation of deportation in the case of any alien under this section, the Attorney General shall record the alien's lawful admission for permanent residence as of the date the cancellation of deportation of such alien is made...."). The new language is similar, but not identical. See INA § 240A(b), 8 U.S.C. § 1229b(b) (1998). It provides the conditions under which the Attorney General may cancel the removal of and adjust the status of an alien otherwise deportable, and does not make any real distinctions between the two procedures.
 
 
 29
 Given a colorable question of statutory interpretation, coupled with precedent in the INA for distinguishing the two procedures, see 8 U.S.C. §§ 1158-59 (asylum adjustments), the district court did not abuse its discretion in finding that a sufficiently serious question existed justifying entry of a preliminary injunction.
 
 
 30
 The final "serious question" presented to the district court concerned whether the directives had the effect of applying the 4,000 annual limitation prior to the section's effective date. Subsequent amendments to IIRIRA § 309(c)(7) clarified that the cap did not apply to adjustments made prior to April 1, 1997. See Nicaraguan Adjustment and Central American Relief Act § 204(a), Pub.L. No. 105-100, 111 Stat. 2160 (Nov. 19, 1997). This clarification was not made until November 19, 1997; in the meantime, by suspending the adjudicatory process, the directives had the effect of imposing the restriction on pending cases. Thus, with the value of hindsight, it is clear that the directives were contrary to congressional intent. However, even evaluating them in light of the law as it stood at the time of the district court hearing, the court did not abuse its discretion in determining this to be a sufficiently serious issue to warrant issuance of the preliminary injunction.
 
 
 31
 The district court also found that the balance of hardships weighed heavily in the plaintiffs' favor. The record supporting this finding is compelling. One of the plaintiffs was suffering from cancer and risked losing any hope of life-saving treatment if deported to Nicaragua. Another young girl who has lived in the United States since the age of three had already made a prima facie showing of extreme hardship if forced to return to El Salvador, but the Creppy directive prevented an immigration judge from deciding her application before April 1. Without a preliminary injunction, the court found, the plaintiffs may never have an opportunity to seek review of the actual cause of denial of their applications for suspension of deportation.
 
 IV
 
 32
 Contrary to the government's assertions, the district court did not err in requiring notice to the class. Under Fed.R.Civ.P. 23(d)(2), the district court may make appropriate orders requiring notice of any aspect of a class action "for the protection of members of the class." Notice is not required in Rule 23(b)(2) class actions. Nonetheless, the district court amended the preliminary injunction on September 17, 1997, and ordered the government to provide notice of the pending action and the injunction via an inclusion into the deportation notices sent to class members whose applications for suspension of deportation were denied under IIRIRA § 309(c)(5). The court found that notice would not be unduly burdensome and would prevent the irreparable harm of an erroneous deportation.
 
 
 33
 A class action plaintiff is normally expected to bear the cost of notice to the class. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178-79, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The Supreme Court has recognized, however, that "[i]n some instances, ... the defendant may be able to perform a necessary task with less difficulty or expense than could the representative plaintiff." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 356, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). As the plaintiffs point out, there is no real burden to the government in providing notice because it can easily be attached to an order denying a class member's suspension application; the government made no presentation as to any additional costs associated with providing this notice. The plaintiffs also argued that notice was required to inform class members that equitable relief may be available, and to ensure that the INS did not mistakenly deport a class member. Plaintiffs also correctly note that the INS is uniquely positioned to ascertain class membership. Given these considerations, we cannot say the district court erred in requiring notice.
 
 V
 
 34
 The district court did not err in requiring the plaintiffs to post a nominal bond of $1,000 pursuant to Fed.R.Civ.P. 65(c), which provides:
 
 
 35
 Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.
 
 
 36
 Our sister circuits have construed Fed.R.Civ.P. 65(c) as investing the district court with discretion as to the amount of security required, if any. See, e.g., Doctor's Associates, Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir.1996) (affirming district court's decision not to require bond); Moltan Co. v. Eagle-Picher Industries, Inc., 55 F.3d 1171, 1176 (6th Cir.1995) (district court has discretion to require posting of security); Stockslager v. Carroll Elec. Co-op. Corp., 528 F.2d 949, 951 (8th Cir.1976) (amount of bond required upon the issuance of a preliminary injunction vests within the sound discretion of the trial court and will not be reversed on appeal unless there is a clear abuse of discretion). We agree with this rationale. The district court is in a far better position to determine the amount and appropriateness of the security required under Rule 65, and we will review the court's determination only for an abuse of discretion.
 
 
 37
 In this case, the court found that any cost to the government, in the event it is found to have been wrongfully enjoined, would be minimal. The court specifically noted the public interest underlying the litigation and the unremarkable financial means of the class as a whole. The government argued that its costs--if forced to not deport aliens which it would otherwise deport, and appealing this action--were substantial. However, defendants did not tender any evidence on the issue. The plaintiffs noted that while they had not made a showing of indigency, the vast majority of aliens were very poor. Absent any showing by defendants of cost, we cannot say the district court clearly abused its discretion in determining the bond amount.
 
 VI
 
 38
 Since the preliminary injunction was issued, Congress has passed the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub.L. No. 105-100, 111 Stat. 2160 (Nov. 19, 1997). Passage of NACARA was prompted in part by the concerns underlying this action. Many class members are potentially affected by the new continuous physical presence requirements of IIRIRA § 309(c)(5). In Astrero, we held that section 309(c)(5) became effective April 1, 1997, and that individuals in deportation proceedings prior to that date could continue to accrue credit toward the seven year continuous physical presence requirement. 104 F.3d at 266. Following Astrero, the BIA issued In Re N-J-B, Int. Dec. 3309 (BIA 1996) which reached the opposite conclusion. In Re N-J-B was subsequently vacated by the Attorney General on July 10, 1997, who concomitantly announced plans to submit clarifying legislation to Congress. The result was enactment of NACARA, which amended IIRIRA § 309(c)(5) to provide special rules regarding applications for suspension of deportation and cancellation of removal by certain qualifying individuals, particularly citizens of Guatemala, El Salvador, and certain former Soviet bloc countries. Because some of the applicants who qualify for special treatment under NACARA are also members of the certified class, the district court may wish to consider class composition, whether creation of subclasses is appropriate, and whether certain named representatives should continue in that role. NACARA does not, as the government seems to imply, require dismissal. However, it may require further examination by the district court.
 
 VII
 
 39
 We express no opinion on the ultimate merits of this action, but affirm the district court's entry of a preliminary injunction, which was within its jurisdiction under Walters. We hold that the district court did not err in requiring notice to the certified class, nor in establishing the appropriate amount of security. We remand for continuation of the litigation, and for the district court's further examination of the class pursuant to NACARA.
 
 
 40
 AFFIRMED AND REMANDED.
 
 
 41
 HALL, Circuit Judge, dissenting.
 
 
 42
 I dissent because the district court lacks jurisdiction to consider plaintiffs' claims under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104-208, 110 Stat. 3009, amended by Act of Oct. 11, 1996, Pub.L. No. 104-302, 110 Stat. 3656 (codified in part at 8 U.S.C. § 1252(g) (Supp. II 1996)). At the very least, we should defer this case pending the Supreme Court's decision in American-Arab Anti-Discrimination Comm. v. Reno, 119 F.3d 1367 (9th Cir.1997), cert. granted, --- U.S. ----, 118 S.Ct. 2059, 141 L.Ed.2d 137 (1998).
 
 
 43
 The plain language of 8 U.S.C. § 1252(g) clearly deprives the district court, and this Court, of jurisdiction over the instant matter. The statute states in relevant part:
 
 
 44
 Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.
 
 
 45
 8 U.S.C. § 1252(g) (Supp. II 1996).
 
 
 46
 Section 1252(g)'s plain language becomes all the more compelling when one recalls the Supreme Court's recent statement that " '[f]or reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. [O]ver no conceivable subject is the legislative power of Congress more complete.' " Reno v. Flores, 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (quoting Mathews v. Diaz, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)) (internal citation and quotation omitted) (alteration in original). Importantly, "aliens have no constitutional right to judicial review of deportation orders." Duldulao v. INS, 90 F.3d 396, 400 (9th Cir.1996).
 
 
 47
 The majority relies on Walters v. Reno, 145 F.3d 1032 (9th Cir.1998), petition for cert. filed, 67 U.S.L.W. 3337 (U.S. Nov. 3, 1998) (No. 98-730), to argue that section 1252(g) does not deprive the district court of subject matter jurisdiction, notwithstanding its plain language to the contrary. Walters involved a due process challenge to the forms the INS used in document fraud proceedings. The plaintiffs in that case claimed that the forms did not adequately inform them of how to request a hearing or the results of failing to request such a hearing. See id. at 1036. In finding that it had jurisdiction to decide the case, Walters relied on (1) the procedural, not substantive, nature of the challenge, (2) the courts' preference to retain authority to consider constitutional claims, and (3) the fact that the claims did not arise from any " 'decision or action by the Attorney General to commence proceedings, [or] adjudicate cases.' " Id. at 1052 (quoting 8 U.S.C. § 1252(g)).
 
 
 48
 None of these considerations is at issue in this case. First, a decision on the merits of this case would actually be substantive, and not merely procedural. The district court has found that the plaintiffs are now eligible for suspension of deportation. The court has defined the class to include plaintiffs who have received favorable administrative determinations, and who therefore await only the final adjudication of their claims. If the district court finds that the administrative orders of Chief Immigration Judge Creppy and Chairman Schmidt were issued in error, the substance of the plaintiffs' claims will have been effectively decided. The immigration judges will enter their final orders and suspend the plaintiffs' deportation.
 
 
 49
 Thus, this is not like the situation in McNary, 498 U.S. 479, 495, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) where the Supreme Court emphasized that "the individual respondents in this action do not seek a substantive declaration.... Rather, if allowed to prevail in this action, respondents would only be entitled to have their case files reopened and their applications reconsidered in light of the newly prescribed INS procedures." McNary v. Haitian Refugee Ctr., Inc.; see also Walters, 145 F.3d at 1052 (stressing the procedural, not substantive, nature of plaintiffs' claims).
 
 
 50
 Second, this Court retains its ability to review the plaintiffs' claims, constitutional and otherwise. The plaintiffs would presumably be able to present their arguments to the Ninth Circuit in an appeal from a final order of removal. See 8 U.S.C. § 1252(b)(9) (Supp. II 1996); see also Naranjo-Aguilera v. INS, 30 F.3d 1106, 1114 (9th Cir.1994) (collecting cases supporting the proposition that "[p]etitioners appealing orders of deportation routinely bring statutory and constitutional challenges to INS regulations and policies."). Any remaining constitutional claims could be reviewed in the district court via a petition for a writ of habeas corpus. See 28 U.S.C. § 2241 (1994); Magana-Pizano v. INS, 152 F.3d 1213, 1216 (9th Cir.), amended by 159 F.3d 1217 (9th Cir.1998), petition for cert. filed, 67 U.S.L.W. 3364 (U.S. Nov. 18, 1998) (No. 98-836) ("the district court retains jurisdiction under 28 U.S.C. § 2241 when the petitioner has no other judicial remedy.").
 
 
 51
 Numerous other courts have held that constitutional habeas review suffices to remove any weaknesses in the section 1252(g) process. See Henderson v. INS, 157 F.3d 106, 118 (2d Cir.1998), petition for cert. filed sub nom. Reno v. Navas, 67 U.S.L.W. 3409 (U.S. Dec. 17, 1998) (No. 98-996) (collecting cases from seven other circuits supporting the proposition that IRRIRA's "repeal of jurisdiction suffers from no constitutional infirmity because the courts retain habeas jurisdiction under 28 U.S.C. § 2241."). Indeed, on facts quite similar to the case at bar, at least one court has found that the availability of habeas review removed any constitutional infirmity from section 1252(g)'s repeal of jurisdiction. See Jean-Baptiste v. Reno, 144 F.3d 212, 220 (2d Cir.1998) (finding that section 1252(g) deprived district court of jurisdiction over plaintiffs' class-action claims that raised due process concerns, but that review under 28 U.S.C. § 2241 removed any constitutional impropriety).
 
 
 52
 Moreover, in Walters, plaintiffs were effectively deprived of any hearing whatsoever. See Walters, 145 F.3d at 1036. Similarly, in McNary, the Court found that plaintiffs could receive no review of the agency action unless they were subsequently apprehended and deportation proceedings were initiated. See McNary, 498 U.S. at 496, 111 S.Ct. 888. In this case, however, plaintiffs were already in deportation proceedings and received a hearing. The immigration judges were only to reserve their final decision on the matter to ensure compliance with the new immigration laws. The Board of Immigration Appeals likewise delayed appeals only "until definitive guidance is provided by the Attorney General's office." Review is therefore available by either an appeal of a final removal order or, if appropriate, by a petition for habeas corpus. See 8 U.S.C. § 1252(b)(9); Magana-Pizano, 152 F.3d at 1216.
 
 
 53
 Third, unlike Walters, which involved a challenge to the forms used by the INS, this case directly involves a "decision or action by the Attorney General to commence proceedings, [or] adjudicate cases." 8 U.S.C. § 1252(g). This suit involves a challenge to the decision of the Attorney General's delegates to reserve final adjudications of grants of suspension of deportation pending further guidance from the Attorney General. The facts of this case are therefore squarely within the terms of section 1252(g).
 
 
 54
 It is also important to note that Walters may have erred in relying so heavily on McNary in interpreting section 1252(g). McNary specifically stated that if Congress had meant to limit the review provisions of the INS statute at issue in that case, it could easily have used broader language that included "all causes ... arising under any of the provisions" in that statute. McNary, 498 U.S. at 494, 111 S.Ct. 888 (internal quotation omitted) (alteration in original). Here, Congress did use broader language. Section 1252(g) states that "[e]xcept as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien." 8 U.S.C. § 1252(g). It is difficult to fathom how Congress could have more clearly conveyed its intent.
 
 
 55
 As a result, the majority's attempt to reconcile the facts of this case with Walters is unavailing. The majority appears to imply that whenever a class of plaintiffs seeks an injunction asserting some form of a constitutional due process claim, and the government attempts to invoke the clear mandate of section 1252(g), the district court should automatically have jurisdiction. But this conclusion ignores the fact that action by the district court in this case would be more of a substantive, instead of procedural, nature; that adequate avenues of review still remain; and that section 1252(g) clearly precludes general review of the Attorney General's decision to adjudicate cases.
 
 
 56
 At the very least, we should defer this case until the Supreme Court issues a decision in American-Arab, argued on November 4, 1998. The Court granted a writ of certiorari to consider "Whether, in light of the Illegal Immigration Reform and Immigrant Responsibility Act, the courts below had jurisdiction to entertain respondents' challenge to the deportation proceedings prior to the entry of a final order of deportation?" Reno v. American-Arab Anti-Discrimination Comm., --- U.S. ----, ----, 118 S.Ct. 2059, 2059, 141 L.Ed.2d 137 (1998). The Court's resolution of this matter should resolve any remaining doubts regarding the question of jurisdiction under section 1252(g).
 
 
 57
 For the foregoing reasons, I respectfully dissent.
 
 
 
 [1]
 Honorable Robert H. Whaley, United States District Judge for Eastern Washington, sitting by designation
 
 
 [2]
 The new annual limitation, codified in 8 U.S.C. § 1229b(e) provides: "(1) AGGREGATE LIMITATION. Subject to paragraphs (2) and (3), the Attorney General may not cancel the removal and adjust the status under this section, nor suspend the deportation and adjust the status under section 1254(a) of this title (as in effect before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996), of a total of more than 4,000 aliens in any fiscal year. The previous sentence shall apply regardless of when an alien applied for such cancellation and adjustment, or such suspension and adjustment, and whether such an alien had previously applied for suspension of deportation under section 1254(a) of this title. The numerical limitation under this paragraph shall apply to the aggregate number of decisions in any fiscal year to cancel the removal (and adjust the status) of an alien, or suspend the deportation (and adjust the status) of an alien, under this section or such section 1254(a) of this title
 (2) Fiscal Year 1997. For Fiscal Year 1997, paragraph (1) shall only apply to decisions to cancel the removal of an alien, or suspend the deportation of an alien, made after April 1, 1997. Notwithstanding any other provision of law, the Attorney General may cancel the removal or suspend the deportation, in addition to the normal allotments for fiscal year 1998, of a number of aliens equal to 4,000 less the number of such cancellations of removal and suspensions of deportation granted in fiscal year 1997 after April 1, 1997.
 
 
 [3]
 The new INA § 240A(d)(1), codified at 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), added by IIRIRA § 304(a)(3), 110 Stat. at 3009-595, provides: "For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 1229(a) of this title or when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or (4) of this title, whichever is earliest."
 
 
 [4]
 See IIRIRA § 309(b) ("The Attorney General shall first promulgate regulations to carry out this subtitle by not later than 30 days before the title III-A effective date.")
 
 
 [5]
 According to their complaint, plaintiffs Alonso Antonio Barahona-Gomez, his wife, and their three children are natives and citizens of Nicaragua. In February 1997, an immigration judge determined that the family deserved a suspension of deportation, but declined to issue a formal decision to this effect because of the Creppy directive
 Plaintiffs Santiago Ramon Sequeira, his wife, and their daughter are natives and citizens of Nicaragua. They entered the United States in 1985 and were served with an Order to Show Cause in 1989. In March 1994, the Sequeiras moved the BIA to reopen their deportation proceedings so that they could apply for a suspension of deportation. The BIA found they had presented a prima facie case and granted the motion to reopen. Irrespective of the merits of their case, however, they were not be able to obtain a final decision before April 1, 1997.
 Plaintiffs Brenda Verzosa and her son Dino are natives and citizens of the Philippines. They applied for and received a suspension of deportation in October 1996. The INS appealed that decision to the BIA, arguing that the Verzosas did not have the requisite ten years in the United States as required by IIRIRA § 309(c)(5). After the Ninth Circuit issued its opinion in Astrero, holding that § 309(c)(5) did not take effect until April 1, 1997, the Verzosas moved the BIA to dismiss the Service's appeal. Due to the Schmidt directive, the BIA has failed to act.
 Plaintiff Carole Beltran is a 15-year old native and citizen of El Salvador. After being denied asylum, she was granted deferred enforced departure. In March 1996, she moved the BIA to reopen her proceedings so that she could apply for a suspension of deportation. That motion was granted and Beltran had a hearing before an immigration judge on March 18, 1997.
 
 
 [6]
 We are mindful that a petition for certiorari has been filed in Walters, and that a writ of certiorari has been granted in American-Arab Anti-Discrimination Committee v. Reno, 119 F.3d 1367 (9th Cir.1997), cert. granted, --- U.S. ----, 118 S.Ct. 2059, 141 L.Ed.2d 137 (1998), the results of which may bear on this issue. However, we note that this is an appeal from a preliminary injunction based in large measure on the irreparable hardships placed on the plaintiffs absent injunctive relief during the pendency of the action. If binding authority concerning these jurisdictional matters is altered during the course of litigation, the district court will have ample opportunity to act in accordance therewith