**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARLOS P. NAVARRO; BELEM
CAROLINA NAVARRO,
                    *Petitioners,*

            v.

MICHAEL B. MUKASEY,* Attorney
General,

                    *Respondent.*

No. 04-70324

Agency Nos.
A74-364-026
A74-789-491

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 20, 2006—Pasadena, California

Filed March 4, 2008

Before: Harry Pregerson, Ronald M. Gould, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Pregerson;
Concurrence by Judge Clifton

*Michael B. Mukasey is substituted for his predecessor, Alberto Gonzales, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**COUNSEL**

Kevin A. Bove, Escondido, California, for the petitioners.

Peter D. Keisler, Assistant Attorney General, Civil Division, United States Department of Justice, David Bernal, Assistant Director, Anthony C. Payne, Attorney, Office of Immigration Litigation, Civil Division, Washington, D.C., for the respondent.

## OPINION

PREGERSON, Circuit Judge:

Petitioners Carlos Navarro and Belem Carolina Navarro (the "Navarros") moved the Board of Immigration Appeals ("BIA") to reopen their deportation proceedings on the basis that they qualified for the benefits of the *Barahona-Gomez v. Ashcroft*, 243 F. Supp. 2d 1029 (N.D. Cal. 2002) ("*Barahona-Gomez II*"), class action settlement.[1] That settlement allows certain eligible aliens to apply for suspension of deportation under the less stringent pre-Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), *as amended by* Pub. L. No. 104-302, 110 Stat. 3656 (1996), continuous physical presence standard. *Id.* at 1033. The BIA found that the Navarros did not qualify for *Barahona-Gomez* relief and denied their motion to reopen. The Navarros now seek our review of the BIA's order. We have jurisdiction and, for the reasons that follow, grant the Navarros' petition for review.

## BACKGROUND

Because this case requires us to interpret the *Barahona-Gomez* settlement and to determine whether the Navarros qualify for its benefits, we begin with a discussion of the events that gave rise to the settlement followed by a discussion of the settlement itself.

---

[1]While we refer to *Barahona-Gomez v. Ashcroft* as "*Barahona-Gomez II*," we refer to the settlement therein as the *Barahona-Gomez* settlement.

### I.   The History of the *Barahona-Gomez* Settlement

Before IIRIRA took effect on April 1, 1997, an alien against whom deportation proceedings had been commenced could apply for suspension of deportation, if, among other things, she had been continuously physically present in the United States for seven years. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 597 (9th Cir. 2002) (citing 8 U.S.C. § 1254 (repealed 1997)). Under the pre-IIRIRA statutory regime, an alien in deportation proceedings continued to accrue time toward satisfying the seven-year residency requirement during the pendency of her immigration proceedings. *See id.* at 598. The pre-IIRIRA regime set no limit on the number of applications for suspension of deportation that the Attorney General could grant. *See* 8 U.S.C. § 1254(a) (repealed 1997).

Relevant here, IIRIRA contained a "stop-clock" provision which provided that an alien stopped accruing time toward the residency requirement when she was served with a notice to appear (or an order to show cause ("OSC") — the pre-IIRIRA equivalent). *See Jimenez-Angeles*, 291 F.3d at 598. IIRIRA also provided that the Attorney General was limited to granting 4,000 applications for suspension of deportation per fiscal year. *See* 8 U.S.C. § 1229b(e)(1). Both changes applied to all applications for suspension of deportation pending at the time of IIRIRA's April 1, 1997, effective date. *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1232 (9th Cir. 1999) ("*Barahona-Gomez I*").

As IIRIRA's effective date drew near — specifically, by February 11, 1997 — the Attorney General's Executive Office for Immigration Review had already granted approximately 3,900 applications for suspension of deportation that fiscal year. *See id.* Chief Immigration Judge ("IJ") Michael Creppy was concerned that the number of suspension applications granted might exceed IIRIRA's statutory 4,000 application cap. *See id.* Accordingly, on February 13, 1997, Chief IJ

Creppy directed that all IJs reserve decision on any suspension of deportation application on which the IJ intended to grant suspension of deportation, or to make such grants conditional on the number of applications already granted. *See id.* The BIA also stopped processing appeals in which a grant of suspension of deportation relief might result. *See id.*

In March of 1997, several aliens who were eligible for suspension of deportation under pre-IIRIRA law, but whose applications would be denied under IIRIRA, sought and won preliminary injunctive class relief that prevented IJs and the BIA from implementing Chief IJ Creppy's directive. *See id.* at 1233. We upheld that preliminary injunction on appeal. *See id.* at 1238.

In December 2002, the district court for the Northern District of California approved a settlement between Attorney General John Ashcroft and the class of aliens who had been adversely affected by Chief IJ Creppy's directive or its BIA equivalent. *See Barahona-Gomez II*, 243 F. Supp. 2d at 1030-39 (reproducing settlement agreement). The settlement permitted certain eligible aliens to apply for "renewed suspension" of deportation under the pre-IIRIRA rules. *See id.* at 1033.

Included among those eligible for relief, according to the settlement, were "individuals for whom the Immigration Judge . . . scheduled a merits hearing on a suspension application . . . between February 13, 1997 and April 1, 1997, and the hearing was continued until after April 1, 1997. . . ." *Barahona-Gomez II*, 243 F. Supp. 2d at 1031-32. The settlement also required the BIA to reopen cases where it had denied an application for suspension of deportation "based solely on [IIRIRA] Section 309(c)(5)." *Id.* at 1035.[2]

---

[2]IIRIRA section 309(c)(5) prescribes the scope of application for the stop-time rule. Congress stated that both paragraphs (1) and (2) of § 1229b(d) (which describes the special rules relating to continuous resi-

## II.  The Navarros' Petition for Review

The Navarros, brother and sister, are natives and citizens of Mexico. They entered the United States without inspection on November 5, 1989, and have since remained.

On October 4, 1996, the Immigration and Naturalization Service ("INS")[3] issued an OSC, charging the Navarros as deportable under section 241(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §1227(a)(1)(B), because they entered the United States without inspection. They were ordered to appear before an IJ.

After several *pro se* appearances and continuances, the Navarros appeared with counsel for their deportation hearing on March 3, 1997. They conceded deportability and indicated that they wished to apply for suspension of deportation. The IJ asked both parties to submit a brief about whether IIRIRA — the "stop-clock" rule in particular — should apply to the applications, and continued the Navarros' deportation hearing to April 1, 1997.

After receiving testimony from the Navarros and their mother on April 1, 1997, the IJ denied their applications. The IJ concluded that the "stop-clock" rule applied as of April 1, 1997 — the date of the hearing — and that, under the new rule, the Navarros were unable to establish seven years of continuous physical presence prior to service of the OSCs.

dence or physical presence) were to be applied in deportation proceedings commenced "before, on, or after" April 1, 1997, IIRIRA's effective date. IIRIRA § 309(c)(5), Pub. L. 104-208, *as amended by* Pub. L. 104-302, 110 Stat. 3656 (1996); *see also* 8 U.S.C. § 1229b(d).

[3]The INS was abolished on March 1, 2003, and its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205. We refer to the agency as the INS here, however, because all of the proceedings at issue in this case took place before the transfer. *See Minasyan v. Gonzales*, 401 F.3d 1069, 1072 n.4 (9th Cir. 2005).

The Navarros appealed to the BIA. On November 28, 2001, the BIA affirmed the IJ's decision in an unpublished order. On July 21, 2003, the Navarros filed a motion asking the BIA to reopen their cases on the basis that they were eligible for *Barahona-Gomez* relief. The BIA denied their motion, explaining that they did not qualify as members in the *Barahona-Gomez* class. This petition for review followed.

## JURISDICTION

We have jurisdiction to review the BIA's determination of eligibility for benefits of the *Barahona-Gomez* settlement. *See Sotelo v. Gonzales*, 430 F.3d 968, 970 (9th Cir. 2005).

## STANDARD OF REVIEW

Eligibility under *Barahona-Gomez* is a question of law reviewed *de novo*. *See id.* Our interpretation of the settlement agreement is governed by principles of California contract law. *See id.*

## DISCUSSION

### I. The Navarros Are "Class Members Eligible for Relief"

The settlement agreement defines class members eligible for relief as:

> individuals for whom the Immigration Judge either reserved a decision, or scheduled a merits hearing on a suspension application under Immigration and Nationality Act ("INA") § 244 (as such section existed in 1996, before amendment by IIRIRA), between February 13, 1997 and April 1, 1997, and the hearing was continued until after April 1, 1997 (other than where all three of the following are present: the continuance was at the request of the alien,

the alien was represented by an attorney, and the transcript of the hearing was prepared following an appeal, and makes clear which party requested the continuance), and . . . (iv) a decision was issued denying or pretermitting suspension based on IIRIRA § 309(c)(5), the appeal was filed, and the BIA denied the appeal based on IIRIRA § 309(c)(5) (irrespective of whether further relief was pursued in federal court, or whether a motion to reopen was subsequently filed with the BIA).

*Barahona-Gomez II*, 243 F. Supp. 2d at 1031-32.

**[1]** This definition can be broken down into two requirements: First, the IJ must have (a) either reserved a decision or "scheduled a merits hearing" on a suspension application between February 13, 1997 and April 1, 1997, and (b) continued the hearing "until after April 1, 1997." Second, the application for suspension must have been denied on the basis of the stop-clock rule. The parties agree that the Navarros' applications for suspension of deportation were denied on the basis of the stop-clock rule. Consequently, the Navarros satisfy the second requirement. Both parts of the first requirement, however, require further analysis.

## A.  *"Scheduled a Merits Hearing"*

**[2]** The parties disagree about what it means to say that the IJ "scheduled a merits hearing" between February 13, 1997, and April 1, 1997. The Navarros argue that the clause requires that the IJ *undertook the act of setting* the hearing between February 13 and April 1. The Government, in contrast, argues that to meet this requirement, the IJ must have scheduled the hearing *to take place* between February 13 and April 1.[4]

---

[4]Although a hearing was conducted on March 3, 1997, that hearing cannot be considered the operative hearing for purposes of our calculations because it was at that hearing that the Navarros first requested the opportunity to apply for suspension of deportation.

**[3]** Because the interpretation of this settlement agreement is governed by California contract law, *see Sotelo*, 430 F.3d at 970, we first determine whether the contract language is clear or ambiguous, *see Bank of the West v. Superior Court*, 10 Cal. Rptr. 2d 538, 545 (1992). If the contract language is clear, we give effect to its plain meaning. *See id.*

**[4]** We believe that the settlement language is ambiguous in that it does not support unambiguously either party's interpretation. To "schedule a merits hearing between x and y dates" could simply require that the *act* of scheduling occurred between x and y dates — the interpretation advanced by the Navarros. This reading would be more obvious with the addition of a few words, *e.g.*, stating that the IJ *undertake the act* of scheduling a merits hearing "between x and y dates." On the other hand, the Government's interpretation, that the hearing actually *take place* between x and y dates, could also be inferred from the language. Like the Navarros' interpretation, the Government's reading would be more readily apparent with the addition of a few words, *e.g.*, it would be more proper to say "schedule a merits hearing" *for* a certain period or *to take place* between x and y dates. The language is reasonably ambiguous and thus the plain meaning of the settlement agreement is not clear.

**[5]** Under California rules of contract law, where contract language is susceptible to multiple interpretations, courts attempt to discern which interpretation the parties intended. *See* Cal. Civil Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."); *see also id.* § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). For the reasons set forth below, we find that the Navarros have the better reading.

**[6]** First, the definition of "class members" includes those who "have had (*or would have had*) suspension of deportation

hearings conducted before April 1, 1997 . . . ." *Barahona-Gomez II*, 243 F. Supp. 2d at 1030-31 (emphasis added). Thus, the definition is not limited to those whose merits hearings *took place* before April 1, 1997, but also includes those whose hearings were *scheduled* to have taken place before April 1, 1997, but did not because of a scheduling decision during the operative period by the IJ.

Second, the Government's definition does not adequately cover the relevant group. The *Barahona-Gomez* settlement includes those individuals whose suspension of deportation hearings *may have been* rescheduled as a result of Chief IJ Creppy's February 11th directive. The Government's definition, in contrast, would include individuals whose hearings were not affected by the Creppy directive. For example, under the Government's definition, class membership would include a petitioner whose hearing was scheduled to take place February 13th. Given that there are generally several weeks between the date that an IJ undertakes the act of scheduling a hearing and the date that the hearing occurs, it is highly unlikely that there was adequate time for an IJ to read the February 11th directive and schedule a hearing to take place only two days later. Rather, the February 13th hearing would likely have been scheduled sometime in December or January, long before Chief IJ Creppy issued his directive. As a practical matter, it is therefore impossible to assume that all of the hearings scheduled to take place between February 13th and April 1st were scheduled as a result of the Creppy directive. Consequently, the Government's definition is inadequate.

It is far more reasonable that the February 13th - April 1st period refers to the time period that the IJs *undertook the act of rescheduling* the suspension of deportation hearings — something that they could do — for purposes of the *Barahona-Gomez* settlement — only *after* they had read Chief IJ Creppy's directive. This definition better adheres to the settlement's intention that the class include all those whose hear-

ings were rescheduled as a direct result of Creppy's February 11th directive.[5]

Two interpretative canons support our holding that the Navarros' definition is more appropriate. First, we have consistently held that ameliorative immigration laws enacted by the legislature to forestall harsh consequences should be interpreted in an ameliorative fashion. *See Akhtar v. Burzynski*, 384 F.3d 1193, 1200 (9th Cir. 2004). This case involves a settlement reached between immigrants and the government agency charged with interpreting immigration law — an agreement intended to prevent the harsh consequences of a government agency's actions relating to suspension of deportation. Accordingly, that agreement should be interpreted in an ameliorative fashion. Second, because of the harsh consequences that attach to removal of an alien from the United States, we have held that doubts in interpretation should be resolved in favor of the alien. *See id.* Thus, where the lan-

---

[5]Of course, it is likely that those petitioners who had an interview scheduled to take place before April 1, 1997, had a better chance of having a hearing completed before IIRIRA went into effect. Nonetheless, if our goal is to determine whether an alien's hearing could have been held before April 1, 1997, the Government's interpretation is both over- and under-inclusive. Many hearings scheduled to take place before April 1, 1997, might not have been completed in one session due to witness availability, court and attorney schedules, and the sheer amount of testimony often required to prove elements such as "extreme hardship." And more importantly, many petitioners whose hearings were scheduled during the operative period might have been able to complete the hearing before April 1, 1997. As discussed above, it appears that the Navarros' hearing could have been held before April 1, 1997, but for the court's request for additional briefing on an issue that BIA precedent already foreclosed. It is impossible to reconstruct the IJs' schedules to determine whether the adjudication of requests for suspension of deportation made by applicants like the Navarros could have been completed before IIRIRA took effect. Nevertheless, it is likely that the parties to the settlement contemplated using the Navarros' definition so that those who might have been affected by Chief IJ Creppy's order had the opportunity to demonstrate entitlement to relief.

guage of the settlement is ambiguous, we resolve doubts in favor of coverage under the settlement.[6]

**[7]** In short, if *some* IJs read Chief IJ Creppy's directive to encourage delaying suspension of deportation hearings until IIRIRA applied — and it is now impossible to tell why a particular alien's hearing was delayed and whether that hearing could have been completed before April 1, 1997 — then a reasonable person would think that the parties attempting to remedy the harm caused by Chief IJ Creppy's memorandum would have provided a remedy to *all* such aliens. For this reason, we adopt the Navarros' interpretation of the scheduling language. Because, on March 3 — a date that falls between February 13 and April 1 — the IJ *scheduled* a merits hearing to be continued to April 1, 1997, we hold that the Navarros meet this part of the definition.

---

[6]The settlement agreement's definition is written so as to avoid inquiries into an individual IJ's motivation for delaying the hearing. Nonetheless, the IJ's conduct in this case raises some concerns. The IJ scheduled the hearing for the first day that IIRIRA became effective. Because the IJ knew (or should have known) that the Navarros' applications would be denied if the hearing were held on April 1 or later, the choice to set the hearing for April 1, 1997, is conspicuous.

Ostensibly, the hearing was delayed because the IJ wanted additional briefing — briefing that, on closer review, appears to have been largely useless. In its brief the INS argued that the IIRIRA stop-clock rule applied *before* April 1, 1997, and brought to the court's attention that the BIA had already so held. *See Matter of N-J-B-*, 21 I. & N. Dec. 812, 814 (1997), *abrogated by Guadalupe-Cruz v. INS*, 240 F.3d 1209, 1212, *as amended by* 250 F.3d 1271 (9th Cir. 2001) (subsequently holding that the BIA's interpretation was in error and offering relief to those whose applications were wrongly denied). Thus, the question the IJ posed for further briefing had already been answered by the BIA. If the IJ had followed BIA precedent and not delayed the hearing, the Navarros' applications would likely have been adjudicated under pre-IIRIRA law. The irony is that, by asking for the briefing, the IJ pushed the hearing to April 1, when it was *beyond question* that the stop-clock rule would apply, rendering the briefing a doubly futile effort.

### B. "Continued after April 1, 1997"

**[8]** The Government also argues that the Navarros do not qualify as *Barahona-Gomez* members because their hearing was not continued "until after April 1, 1997," but was held *on* April 1, 1997. This argument is unavailing.

**[9]** The meaning of this phrase is unambiguous, but the language, as memorialized in the written agreement, contradicts the intentions of the parties. IIRIRA's effective date was April 1, 1997 — not April 2, 1997. The definition of the class refers to those who "had (or *would have had*) suspension of deportation hearings conducted before April 1, 1997," *Barahona-Gomez II*, 243 F. Supp. 2d at 1030-31 (emphasis added) — the clear implication being that class members include those who had their hearings April 1, 1997, or later. There is no reason to believe that the parties to the *Barahona-Gomez* settlement agreement meant to help all aliens whose hearings were continued until after IIRIRA went into effect, except the unfortunate few whose hearings were scheduled to occur on the very first day that IIRIRA became effective.

**[10]** Under contract law, we have the power to "reform" a contract where, due to mistake, the clear intention of the parties is not reflected in the final agreement. *See Hess v. Ford Motor Co.*, 41 P.3d 46, 52 (Cal. 2002); 1 Witkins' Summary of California Law, Contracts § 276 (10th ed. 2005) ("Where the parties come to an agreement, but by mistake (or fraud) the written instrument does not *express* their agreement correctly, it may be *reformed* or revised on the application of the party aggrieved. . . ."). Here, it appears that there was a mistake in reducing the agreement to written form. Consequently, we read the settlement language as "continued until April 1, 1997, or after." This interpretation is consistent with the purpose of the *Barahona-Gomez* settlement. *See Sotelo*, 430 F.3d at 972. The settlement remedy is simply the opportunity for eligible class members to have their applications for suspension of deportation heard under the law which would, but for

the improper delay, have governed their cases. *See Barahona-Gomez II*, 243 F. Supp. 2d at 1033.

## CONCLUSION

**[11]** The Navarros were "scheduled" for a merits hearing between February 13 and April 1, their hearing was continued to a date after IIRIRA took effect, and they were denied relief on the basis of the stop-clock rule. They are, accordingly, class members eligible for relief. We therefore **GRANT** the petition for review and **REMAND** their cases to the BIA to determine their eligibility for renewed suspension of deportation.

---

CLIFTON, Circuit Judge, concurring in the judgment:

I do not agree with all that is contained in the majority opinion, specifically Part I.A. of that opinion. (I do not quarrel with Part I.B., involving the April 1, 1997 date.) Application of the *Barahona-Gomez* settlement agreement should be based on the facts of the particular situation, and I do not think the broad interpretation stated by the majority opinion will lead to sensible results in all cases.

But it seems to me that these petitioners fairly fall within the definition of "the Class" contained in the settlement agreement: "all persons who have had (or would have had) suspension of deportation hearings conducted before April 1, 1997," where the "immigration judge reserved or withheld granting suspension of deportation" on the basis of the directive issued by Chief Immigration Judge Creppy.

To briefly summarize, that directive was issued on February 13, 1997. On March 3, 1997, the Navarros and their attorney appeared before the Immigration Judge, conceded deportability, and stated that they wished to apply for suspen-

sion of deportation. The IJ instructed the Navarros to file applications for suspension of deportation and scheduled a merits hearing on their applications for April 1, 1997. On April 1, 1997 the IJ held the merits hearing and denied the Navarros' applications for suspension of deportation pursuant to the IIRIRA stop-clock rule which went into effect that day.

In 1997, April 1 fell on a Tuesday. If the Navarros' hearing had been scheduled one day earlier, on Monday, March 31, the new law would not have applied and they might have been eligible for and obtained the relief they sought. It cannot reasonably be assumed that scheduling their hearing for March 31 or some earlier date was out of the question, so it is clearly possible that the directive influenced the IJ to push the new hearing date past the effective date of the stop-clock rule. If so, then the Navarros were in the situation that the settlement agreement was intended to cover. Thus, I agree that their petition for review should be granted and concur in the judgment.