CHW WEST BAY, dba Seton Medical Center, Plaintiff–Appellant,

v.

Tommy G. THOMPSON,* Secretary of Health and Human Services, Defendant–Appellee.

No. 99–17123.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 2001

Filed April 18, 2001

---

* Tommy G. Thompson, substituted for his predecessor, Donna Shalala, as Secretary of Health & Human Services, Fed. R.App. P. 43(c)(2).

Robert Klein, Foley & Lardner, Los Angeles, California, for the plaintiff-appellant.

Richard K. Waterman, Regional Counsel DHHS, San Francisco, California, for the defendant-appellee.

Before: GOODWIN, HUG, and W. FLETCHER, Circuit Judges.

GOODWIN, Circuit Judge:

Appellant CHW West Bay, dba Seton Medical Center ("Seton") appeals a summary judgment in favor of Shalala, the Secretary of Health and Human Services ("Secretary"). Seton asserts that the fiscal intermediary and Appellee acted improperly by failing to grant it an incentive payment for successfully keeping its operation costs for the Fiscal Year Ending ("FYE") June 30, 1984 below the year-to-year cost rate of increase ceiling established by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), 42 U.S.C. § 1395ww(b). Under TEFRA, the Secretary must (1) grant incentive bonuses to health-care providers that successfully contain the year-to-year increase of their operating costs; and (2) levy penalties on those providers that fail to contain costs. The statute also directs the Secretary to make a downward adjustment to a hospital's operating costs in the event that such costs reflect significant distortions due to, *inter alia*, changes in the hospital's case-mix index that would otherwise have subjected the provider to a TEFRA penalty. *See* 42 U.S.C. § 1395ww(b)(1).

Seton contends that the Secretary's policy of refusing to make adjustments to cover the full amount of the added costs caused by changes in case-mix, thus denying the provider an incentive payment, subverts the plain meaning of the TEFRA statute and therefore must be overturned. *See Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Moreover, Seton argues that, in light of the regulations in effect during FYE June 30, 1984, the Secretary's decision to deny it an incentive payment is arbitrary and capricious in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2) (2000), and represents an impermissible

interpretation of the statute that must be overturned under the second step of the standard set forth in *Chevron*. We have, jurisdiction pursuant to 42 U.S.C. § 1251, and we reverse the summary judgment and remand for further consideration.

## BACKGROUND

The Medicare Act, 42 U.S.C. §§ 1395–1395ggg, establishes a system of health insurance for the aged and disabled. The Act also provides for reimbursement for the costs of services rendered to Medicare patients by health care providers such as hospitals, skilled nursing facilities, and home health care agencies. *See* 42 U.S.C. § 1395c-d. Payment to providers of services is commonly carried out by fiscal intermediaries pursuant to contracts with the Secretary. *See* 42 U.S.C. § 1395h. In this case, the fiscal intermediary is Blue Cross of California.

For the cost reporting year involved in this case, the fiscal year beginning July 1, 1983 and ending June 30, 1984, reimbursement for hospital services to Medicare beneficiaries was based on the "reasonable cost" of such services. *See* 42 U.S.C. § 1395f(b)(1). The Medicare Act also contained two separate restrictions on the amount of operating costs that could be reimbursed to providers. The first restriction was an overall limit on a hospital's operating cost per discharge ("CPD") determined by reference to a peer group of similarly situated hospitals. *See* 42 U.S.C. § 1395ww(a). This limit is commonly referred to as the Section 223 limit because it was originally enacted by Section 223 of the 1972 Social Security Act Amendments.

The second limit was adopted by TEFRA, 42 U.S.C. § 1395ww(b), and is referred to as the TEFRA limit. The purpose of the TEFRA limit is to restrict the amount by which an individual hospital's costs can grow from one year to the

next. The TEFRA limit is based on a "target amount," defined as the hospital's CPD during a base period which is increased each year by an inflation factor plus one percent. *See* 42 U.S.C. § 1395ww(b)(3)(A), (B); *Foothill Presbyterian Hosp. v. Shalala*, 152 F.3d 1132, 1133 (9th Cir.1998). A hospital whose costs exceed the target amount is penalized—it is paid only its costs up to the target amount plus 25% of the costs which exceed that amount. (Thus, a TEFRA "penalty" is in fact partial payment for actual costs above the target amount). A hospital whose costs are below the target amount is entitled to an incentive bonus equal to 50% of the difference between its actual operating costs for the year and the target amount, or 5% of the target amount, whichever is less. *See* 42 U.S.C. § 1395ww(b)(1).

The Secretary is directed by the statute to provide a method for recognizing the effects of significant distortions between a hospital's cost in its base period and its costs during the cost-reporting period under review. *See* 42 U.S.C. § 1395ww(a)(2). The Secretary promulgated regulations at 42 C.F.R. § 405.460(f)-(h) (1983) and 42 C.F.R. § 405.463(f)-(h) (1983) providing for a system of exemptions, exceptions, and adjustments to account for the various distortions that may be reflected in a provider's operating costs.

At the close of its fiscal year, a provider must submit a "cost report" showing its costs incurred during the fiscal year and the appropriate portion of those costs to be allocated to Medicare. 42 C.F.R. §§ 413.20(b) and 413.24(f) (1983). The fiscal intermediary then analyzes and audits the report, and informs the provider of the determination of the amount of Medicare reimbursement. 42 C.F.R. § 405.1803. In the event a provider is dissatisfied with this determination, it may appeal the decision to the Provider Reimbursement Review Board ("PRRB"). *See* 42 U.S.C. § 1395oo(a). The decision of the PRRB is final unless the Secretary reverses, affirms, or modifies it within 60 days of the provider's receipt of the PRRB decision. *See* 42 U.S.C. § 1395oo(f)(1).

A provider may request an exemption, exception, or adjustment within 180 days of the intermediary's determination "where events beyond the hospital's control or extraordinary circumstances ... create a distortion in the increase in costs for a cost reporting period" or where the Secretary otherwise "deems appropriate." 42 U.S.C. § 1395ww(b)(4)(A); 42 C.F.R. § 413.40(e). After such request, the fiscal intermediary makes a recommendation to the Health Care Finance Administration ("HCFA"), which makes the decision. 42 C.F.R. § 413.40(e)(2), (3). A provider may obtain judicial review of a final administrative decision by filing suit in district court within 60 days of receipt of the decision. *Id.*

Seton is a not-for-profit acute care hospital located in Daly City, California. During its cost reporting period ending June 30, 1983, Seton incurred a Medicare cost per discharge of $4,751.14. For purposes of determining the TEFRA limit, FYE 6/30/83 was Seton's base year. The target amount for FYE 6/30/84, based on the base period CPD, was $5,078.97 per discharge, factoring in the appropriate inflation index plus 1%. The target amount was subsequently increased to $5,186.25 per case.

During FYE June 30, 1984, Seton incurred a CPD of $5,423.33. Its costs therefore exceeded both its Section 223 limit and the TEFRA target amount. The fiscal intermediary determined that Seton was subject to a TEFRA penalty, and disallowed 75% of the amount by which Seton's CPD exceeded the limit. Seton filed a timely appeal to the PRRB regarding the intermediary's determination, and

submitted a separate application to the HCFA for an exception and adjustment. The HCFA determined that the provider's increase in CPD for FYE June 30, 1984 reflected cost distortions resulting from a substantial increase in its case mix index. This increase was due to a dramatic change in its services, including an expansion in cardiovascular surgery, cardiac rehabilitation, and diagnostic services that resulted from the addition to its staff of two prominent cardiologists.

For this reason, HCFA determined that Seton qualified for an adjustment, and adjusted the TEFRA limit so that it matched Seton's actual costs, thereby erasing the penalty that Seton would have had to pay for the costs above the TEFRA limit. However, HCFA did not increase the target amount by the full amount attributable to the change in case mix, on the ground that exceptions or adjustments to the target amount could not be granted if the approval would create a TEFRA incentive payment.

Dissatisfied with the HCFA ruling, Seton continued pursuit of its PRRB appeal. In a unanimous decision, the PRRB agreed with Seton's contention that it was entitled to an adjustment in the inpatient operating cost limit to reflect the entire change in case mix. The PRRB interpreted the relevant regulations to mean that when a significant cost distortion beyond a provider's control is recognized, the operating costs are adjusted, not the TEFRA target limit. The PRRB therefore concluded that the Secretary's decision to adjust the TEFRA target amount to equal the provider's CPD—thereby precluding the application of incentive payments to adjustments—was unreasonable. According to the PRRB, Seton's CPD should have been adjusted downward by $673.61 per discharge to account for the *full amount* of the cost distortions, and Seton

was therefore entitled to an incentive payment in the amount of $872,425.

The Intermediary requested review of the PRRB's decision, and on February 6, 1998, the Administrator of the HCFA reversed. The Administrator found that the intermediary properly denied Seton the full incentive payment under the exception/adjustment process. The Administrator interpreted the regulations to reflect a "long-standing policy" of not permitting adjustments that increase or result in incentive payments. The Administrator furthermore determined that in the event a provider's CPD reflects significant cost distortions, its *TEFRA limit* should be ratcheted up to the amount of its actual costs, while the costs themselves should remain unadjusted.

Seton appealed to the district court, where the court granted the appellee's motion for summary judgment. As a threshold matter, the district court ruled that 42 U.S.C. § 1395ww(b) did not specifically address the question whether incentive payments should be made to providers whose fully adjusted CPD would fall below the TEFRA limit. The district court found it significant that the Congressional Conference Committee adopted the Senate bill, which, unlike the House bill, did not contain an incentive payment provision. The court concluded that the adjustment process was not intended to encompass situations where a provider was seeking to create or increase a bonus payment.

The district court further found that the statute and regulations supported the Secretary's policy of making adjustments to limits and not costs in the case of a distorted CPD. Accordingly, it ruled that the Secretary's interpretation of the statute was not "arbitrary and capricious" within the meaning of the APA. It therefore granted the Secretary's motion for summary judgment.

## I  Standard of Review

■ We review the district court's grant of summary judgment de novo. *See Foothill Presbyterian Hosp. v. Shalala,* 152 F.3d 1132 (9th Cir.1998). The Administrative Procedure Act specifies that an agency decision should be overturned only if it is found to be arbitrary, capricious, an abuse of discretion, is otherwise not in accordance with the law, or is unsupported by substantial evidence. *See id.* at 1134; *Akiak Native Comm. v. U.S. Postal Serv.,* 213 F.3d 1140, 1144, (9th Cir.2000). Under the APA, substantial deference must be accorded an agency interpretation of its own regulations. *See Providence Hosp. of Toppenish v. Shalala,* 52 F.3d 213, 216 (9th Cir.1995).

■ In reviewing an agency's construction of a statute, we apply the test set forth in *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The *Chevron* test has two steps. We must first determine whether Congress has directly spoken to the precise question at issue. *See id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If, however, the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *See id.* *Chevron* step two therefore analyzes the reasonableness of an agency's interpretation, while "arbitrary and capricious" review under the APA focuses on the reasonableness of an agency's decision-making processes. *See Transitional Learning Comm. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.,* 220 F.3d 427, 430 n. 2 (5th Cir.2000); *Hells Canyon Alliance v. U.S. Forest Serv.,* 227 F.3d 1170, 1179 (9th Cir. 2000) (reviewing an agency's decision-making processes under the "arbitrary and capricious" standard).

■ Under *Chevron* step two, if the agency's interpretation is a reasonable one, this court "may not substitute its own construction of [the] statutory provision...." *Fernandez v. Brock,* 840 F.2d 622, 631 (9th Cir.1988). Hence, even if the agency's interpretation is not the only possible one, or even if it is not the one the court would have chosen, it should nevertheless stand if it is reasonable. *See Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778; *McLean v. Crabtree,* 173 F.3d 1176, 1181 (9th Cir.1999). However, deference is not owed to an agency decision if it construes a statute in a way that is contrary to congressional intent or frustrates congressional policy. *See Anaheim Mem'l Hosp. v. Shalala,* 130 F.3d 845, 849 (9th Cir.1997).

## II  *Chevron* Step One Analysis

■ The court below correctly concluded that 42 U.S.C. § 1395ww is silent with regard to whether Congress intended that incentive bonuses should apply to adjusted costs. The TEFRA provision regarding exceptions and adjustments to a provider's costs contains the following language:

> The Secretary shall provide for an exemption from, or an exception and adjustment to, the method under this subsection for determining the amount of payment to a hospital where events beyond the hospital's control or extraordinary circumstances, including changes in the case mix of such hospital, create a distortion in the increase in costs for a cost reporting period.

42 U.S.C. § 1395ww(b)(1)(A).

Seton contends that the fact that Congress did not distinguish between adjusted and unadjusted costs for the purposes of making an incentive payment makes it "clear that Congress never intended to make" such a distinction. Seton believes

that "[b]ecause the statute nowhere suggests that adjustments are not available to eliminate distortions if the adjusted costs end up below the target amount, the full adjustment should have been granted."

■ Seton exaggerates when it asserts that the TEFRA statute clearly addresses the application of incentive payments to adjustments. It is incorrect to make assumptions on congressional intent from Congress's *silence* on the issue of how adjusted costs affect qualification for an incentive payment. Certainly Congress' failure to distinguish between adjusted and unadjusted costs does not constitute the kind of "direct speech" indicative of clear congressional intent required by *Chevron* step one.

Appellant also asserts that Congress specifically referred to the TEFRA incentive/penalty scheme when it mentioned "the method for determining the amount of payment to a hospital." This argument presents a much closer question because the "method for determining payment" likely encompasses the incentive/penalty scheme set forth in § 1395ww(b)(4)(A). The text of the statute therefore suggests that the adjustment process applies to the incentive provision, although this textual implication falls short of an explicit statement. The Secretary's construction, then, cannot be said to contradict the plain language of the statute, and is therefore still owed deference under *Chevron* step one. The district court did not err in finding that the statute was "ambiguous" on this issue. *See Mercy Hosp. v. Shalala,* 823 F.Supp. 1, 4 (D.D.C.1993) (explicitly rejecting the argument that the Secretary's policy of refusing to adjust payments that increase a hospital's bonus payment is inconsistent with the plain meaning of 42 U.S.C. § 1395ww(b)(4)(A)).

### III *Chevron* Step Two Analysis

1. Legislative History and *Chevron* Permissibility

The district court found it significant that the Congressional Conference Committee adopted the Senate version of the adjustment process, which provided that "[t]he Secretary is required to provide for exemptions, exceptions, and adjustments from the limits in cases [of cost distortion]." According to the district court, the "from the limits" language "reflected Congressional intent to protect hospitals from financial penalty—i.e., not being reimbursed for reasonable costs." We agree that this language suggests that Congress believed the adjustment process would protect providers from unjustified non-reimbursement.[2] Nevertheless, this statement does not foreclose the possibility that incentive bonuses should apply to adjusted costs if other evidence establishes congressional intent along this line.

The district court also observed that the adjustment process stood independent of the incentive provision in the adoption process and saw no reason why the two sections should be read to apply to one another. *See* H.R. Conf. Rep. No. 760, 97th Cong., 2d Sess., pp. 419–22 (1982). Appellant responds that because the House bill contained both an adjustment process and an incentive/penalty program, the Conference Committee was aware of the incentive program when it adopted the Senate bill containing the adjustment provision. However, congressional cognizance of the incentive program does not militate in favor of an assumption that Congress affirmatively *intended* for the adjustment process and the incentive/penalty provision to be read together, which is what Seton would have to demonstrate under the sec-

---

**2.** On this account, "exemption ... from the limits" translates into "protection from impo-

sition of a penalty for exceeding the TEFRA ceiling."

ond step of the *Chevron* analysis. While Seton may be correct in arguing that the legislative history does not reflect congressional intent to limit TEFRA payments in the manner asserted by the Secretary, there is also no evidence that the legislative history makes the Secretary's interpretation impermissible. *See* H.R. Conf. Rep. No. 760, 97th Cong., 2d Sess., pp. 419–22 (1982).

### 2. Purpose of Statute—*Chevron* Permissibility

But this does not end the inquiry on the *Chevron* "permissibility" question. Seton also argues that the Secretary's construction of the statute frustrates the underlying purpose of TEFRA to encourage the efficient delivery of health care services through a system of incentives and penalties. *See Dole v. United Steelworkers of America,* 494 U.S. 26, 35, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) ("On a pure question of statutory construction, our first job is to try to determine congressional intent.... Our starting point is the language of the statute, but in expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (internal quotation marks and citations omitted); *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778; *Trustees of the California State Univ. v. Riley,* 74 F.3d 960, 963 (9th Cir.1996) ("In reviewing an agency's construction of a statute, the court must reject those constructions that are contrary to clear congressional intent or frustrate the policy that Congress sought to implement.").

■ It is undisputed that Congress intended that the scheme of penalty and incentive payments established by § 1395ww(b)(1)(A) would reward efficient hospitals for keeping their costs from growing from one year to the next. Seton points out that the policy of rewarding only unadjusted below-limit CPDs fails to reward otherwise efficient hospitals because of circumstances beyond their control and thus contradicts congressional intent.

Under the TEFRA statute, a provider is defined as either efficient or inefficient depending on whether it successfully contained costs. As we understand the statute, all efficient providers are treated the same. The Secretary can be parsimonious, but not selectively so. The TEFRA limit scheme makes clear that providers are distinguished for purposes of the statute on the basis of being either efficient or inefficient depending on whether they exceed or fall short of the target amount. *See* 42 U.S.C. § 1395ww(b)(1)-(2). In this light, it is impermissible for the Secretary to add a second-order distinction that would create statuses of "adjusted efficient" vs. "unadjusted efficient" in the incentive scheme, thereby precluding incentive payments to efficient providers such as Seton. Certainly there is no textual evidence to support this additional distinction.

Contrary to the Secretary's assertion,[3] Seton is not arguing that the Secretary's construction must provide "the greatest conceivable reward for providers' cost containment." The Secretary's characterization of Seton's argument as a gripe regarding which plan would yield maximum benefits masks the extent to which the Secretary's policy creates a *disparity* in allotting incentive rewards based on unreasonable distinctions between providers. Indeed, the problem is not that the Secretary's interpretation *rewards less,* but

---

**3.** Appellee argues that Seton's argument only demonstrates that the Secretary's interpretation of 42 U.S.C. § 1395ww(b) will at times offer less reward than Seton's interpretation, which is permissible under step two of *Chevron.*

rather that it fails to reward equally efficient hospitals equally.

Analysis under a justice-based "desert" rubric may help to clarify the permissibility issue. Under § 1395ww(b)(4)(A), the HCFA must make exceptions and adjustments to take account of justifiable cost distortions that are "beyond the hospital's control" or due to "extraordinary circumstances." It is undisputed that Seton qualified for an adjustment under this provision (since HCFA made an adjustment to Seton's TEFRA ceiling that made its CPD equal to the limit); thus Seton presumably experienced cost distortions that were justified and for which it should not be penalized. Hospitals that experience such distortions because of extraordinary circumstances do not deserve an incentive payment any less than a similarly situated provider that did not face such circumstances.

We can think of no compelling rationale Congress might have in limiting incentive payments to only unadjusted CPDs that fall below the TEFRA threshold. Such a decision would be tantamount to a holding that providers will be liable for uncontrollable circumstances and justified cost distortions to the extent that they elevate CPDs from a sub-limit sum to the TEFRA limit (but not beyond). Uncontrollable factors and justified changes in case-mix do not provide justifiable ground to deny incentive payments to hospitals that have kept their costs from rising from year to year under the meaning of the statute.

In this light, the Secretary's refusal to make adjustments to the provider's operating costs that reflect the full amount of the changes in case-mix frustrates the underlying purpose of the statute to encourage the efficient delivery of health services by rewarding efficient providers and penalizing inefficient providers. Since the cost distortions that drive the CPDs of providers like Seton above their TEFRA ceiling are due to justified changes in case mix, any distinction the Secretary makes between these providers and those whose CPDs are "naturally" below the target amount for purposes of incentive payments seems arbitrary.

## IV  The APA "Arbitrary and Capricious" Standard

### 1.  Preamble to Regulations

Evidence that the Secretary's decision is "arbitrary and capricious" in violation of the APA inheres in the text of the preamble to 42 C.F.R. § 405.460, in which HCFA states that an adjustment should be made to account for cost distortions whether or not this adjustment drives the provider's CPD below the TEFRA limit. *See Transitional Learning Comm. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.*, 220 F.3d 427, 430 n. 2 (5th Cir.2000) (observing that "arbitrary and capricious" review under the APA focuses on the reasonableness of an agency's decision-making processes, as opposed to the reasonableness of its interpretation); *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1179 (9th Cir. 2000).

The text of the preamble reads:

*Comment:* One comment concerned the statement in the interim regulations that the amount of an exception granted could raise a hospital's limit above its actual cost.

*Response:* Our policy, prior to Pub.L. 97–248, has been to approve an exception (the purpose of which is to recognize a provider's costs in excess of its limit that are not related to inefficiency) only up to the provider's actual incurred cost. *The continuation of this policy under the provision ... could prevent a hospital from receiving the full amount of a rate-of-increase incentive payment for which it would otherwise qualify.*

We agree with the commenters in that we believe it is inappropriate to offer a hospital an incentive payment as a bonus for its efficiency on one hand, while on the other hand, disallowing payment of the full amount of that incentive by applying a limit also designed to encourage efficiency. Therefore we are revising our procedure for determining the amount of exceptions to allow the amount of a hospital's total cost limit under an exception to be set at a level recognizing the full amount of justified costs for the purpose of qualifying for the incentive payment under the rate-of-increase target rate provision.

48 Fed. Reg. 39412, 39416 (Aug. 30, 1983) (emphasis added).

The Secretary contends that the above text is inapplicable because it appears in the preamble to § 405.460, which concerns Section 223 inpatient operating cost limits, as opposed to § 405.463(h), the "rate of increase" subsection under question here. This argument is undermined by the first paragraph of the introduction to the discussion of comments to § 405.463(h), which states that "[r]eaders should be sure to review the discussion of comments both in the schedule of cost limits published separately in this section of the Federal Register, and in the *section on the cost limits earlier in this preamble.*" 48 Fed. Reg. 39417, 39417 (Aug. 30, 1983) (emphasis added). The case for a symmetrical application of the adjustment processes in § 405.463(h) and § 405.460 is also buttressed by the 1982 interim final rule for "Medicare Hospital Reimbursement Reforms: Limitations on Reimbursable Costs and the Rate of Hospital Cost Increases," which provides: "A hospital may request an exemption from or exception to the rate of increase in a manner similar to that used in regard to hospital cost limits established under 405.460...." 47 Fed. Reg. 43282, 43288 (Sept. 30, 1982).

Thus, rather than a bifurcated analysis of the subsections setting forth the only two limitations on reimbursement for reasonable costs, we conclude that a fair degree of symmetry should be assumed between the two subsections, which stand side by side in the code and involve the same scheme of adjustments and incentive/penalty payments. Since the subsection on 223 limits states that adjustments may apply to incentive bonuses, then HCFA probably authorized a similar practice in the context of TEFRA. The preamble to the regulations therefore provides clear evidence that, during the adoption of the 1983 amendments, the agency revised its procedure to allow payment of the full amount of a TEFRA incentive to providers with adjusted CPDs falling below the ceiling.

## 2. Costs vs. Limits

Seton also contends that the Secretary's decision is arbitrary and capricious because it interprets an adjustment to entail the recalculation of the TEFRA limits but not the operating costs for a given provider. The distinction is significant because under the Secretary's method, the fiscal intermediary can simply adjust the TEFRA limit to equal the provider's costs so that it will not qualify for an incentive bonus. On the other hand, if the TEFRA limit remains fixed and the provider's costs are adjusted to subtract the full amount of the cost distortions due to changes in the case mix, then there will be a disparity between the provider's CPD and TEFRA limit, resulting in an incentive payment.

Although 42 U.S.C. § 1395ww(b)(4)(A) does not indicate whether an adjustment to "the method ... for determining the amount of payment" refers to limits or costs, the relevant regulations are more specific. The regulatory provision on adjustments states that the HCFA "may ad-

just the amount of the *operating costs* considered in establishing cost per case for one or more cost reporting periods ... to take into account" factors that could result in cost distortions. 42 C.F.R. § 405.463(h)(1) (emphasis added). In addition, the regulation dealing with adjustments in the context of Section 223 inpatient operating costs explicitly provides that HCFA should make adjustments to operating costs to take into account justifiable distortions due to uncontrollable circumstances (in the same language used in § 405.463(h)(1)).[4] *See* 42 C.F.R. § 405.460(h). Further, as Seton points out, two former HCFA officials testified that costs, not limits, should be adjusted, and that adjustments would thus not affect a hospital's right to an incentive payment.

The Secretary responds that the distinction between "costs" and "limits" is illusory since the TEFRA limit is determined through reference to "costs." Thus, according to the Secretary, the references to costs in the discussion of adjustments in the regulations may in fact refer to costs in the base year and therefore the TEFRA limits that are constructed from these costs.[5] The court below apparently agreed that nothing in the regulations made the Secretary's practice of adjusting the TEFRA target amount without adjusting the costs themselves an unreasonable interpretation of 42 U.S.C. § 1395ww(4)(A).

The provision on adjustments in the regulations indeed explicitly states that the use of the term "costs" refers to costs associated with "both periods subject to the ceiling and the hospital's base period." 42 C.F.R. § 405.463(h)(1). Hence, strictly speaking, the Secretary's contention that the provision need not refer exclusively to

post-base period CPD index is correct. However, to suggest (as the Secretary does) that the fact that both periods are referenced by the provision grants the HCFA *discretion* in choosing which costs (base period or reporting year) to adjust in the event that later costs reflect case-mix changes presents a dubious reading at best. The Secretary's observation that "costs considered in establishing cost per case" may include base period costs (and therefore the TEFRA limit) is not an *ipso facto* indication that Seton's reading is flawed. The Secretary's "discretion" hypothesis in fact contravenes the most common-sense reading of the regulation: that adjustments to the base period costs are authorized, but only when base-period CPDs reflect distortions. Indeed, the Secretary fails to distinguish between adjustments made to the base period because of (1) base period distortions (due to changes in the case mix, etc.) and (2) cost-reporting period distortions. We conclude that only the former adjustments are permitted by the regulations.

The regulatory language communicates that HCFA may adjust the base period index if there are distortions manifest in the actual base period CPD, but does not necessarily authorize a post-hoc recalculation of the base period costs in order to elevate the TEFRA limit in the event that' *later period costs* (those costs subject to the TEFRA ceiling) reflect significant distortions. To adjust base period costs when it is the *reporting period* costs that reflect case-mix fluctuations is an awkward and strained reading of the regulation. It is more likely that HCFA simply intended for base period costs to be adjusted only if those costs are themselves distorted.

---

4.  This argument also lends support to the theory that symmetry should be read into the TEFRA and Section 223 subsections.

5.  The Secretary argues that "many of the regulations' references to 'costs' ... involve the *limits, not the provider's costs in the year for which the provider is seeking reimbursement.*" (second emphasis added).

Against this backdrop, we agree with Seton's argument that the pertinent regulations direct HCFA to adjust a provider's operating costs as opposed to its TEFRA limit. As discussed above, reduced operating costs and a fixed TEFRA limit would create a disparity between costs and limits in cases like Seton's. The regulations thus strongly suggest that HCFA should make adjustments for the full amount of operating costs so that incentive payments can be made to providers with adjusted CPDs that fall below the TEFRA limit.

Nevertheless, according to the Secretary's final administrative decision denying Seton an incentive payment, the regulations make clear that adjustments are limited to "reasonable costs," which are defined as costs actually incurred. *See* 42 U.S.C. § 1395x(v)(1). Such a limitation would preclude an incentive payment in cases like Seton's because an adjustment cannot result in a payment that is more than actual out-of-pocket expenses. However, TEFRA does not allocate direct reimbursement for costs, but instead rewards providers based on the *comparison of costs* between two different periods. In other words, an incentive bonus is distinct from a reimbursement, and only direct reimbursements would be limited to a provider's actual costs. *See Mt. Diablo Hosp. District v. Shalala,* 860 F.2d 951, 957 n. 7 (9th Cir.1988) (holding that "TEFRA penalties, *unlike TEFRA bonuses,* are partial payments for actual costs") (emphasis added). We therefore conclude that incentive payments need not be limited to actual costs in view of the fact that a TEFRA reward is not a direct reimbursement for costs.

### 3. Exceptions vs. Adjustments

The preamble to the 1982 interim final promulgation of 42 C.F.R. § 405.463 contains the following statement: "A hospital may request an exemption from or exception to the rate of increase ceiling.... An exception allows a hospital to have its ceiling adjusted to take costs into account that would otherwise be disallowed by application of the ceiling." 47 Fed. Reg. 43282, 43288 (Sept. 30, 1982). This language is significant because it appears to provide that (1) a hospital's TEFRA limit (as opposed to its operating costs) should be adjusted to account for distortions; and therefore, (2) that the TEFRA exception was intended to prevent the non-reimbursement of costs due to the TEFRA ceiling.

However, such language is at odds with the previously discussed subsection on § 404.463 adjustments appearing later in the preamble, which directs HCFA to "adjust the *amount of the operating costs* considered in establishing cost per case" to account for distortions. 47 Fed. Reg. 43291, 43293 (Sept. 30, 1982) (emphasis added). Another later provision concerning exceptions also directs the HCFA to make adjustments to "operating costs" and not the TEFRA ceiling. *See* 42 C.F.R. 43289, 43293 ("*Exceptions, 1. General procedure.* HCFA may adjust a hospital's operating costs ... upward or downward....").

If HCFA adjusts the TEFRA ceiling and not a provider's operation costs, then application of an exception would indeed only account for those costs that would normally be precluded by the TEFRA ceiling. But to the extent that the later discussions of the exception process explicitly direct HCFA to adjust costs, then the statement in the general process discussion is called into question, for the deployment of full cost adjustments means that incentive payments may be triggered if the adjustments drive the provider's CPD below the TEFRA limit. Thus, although the subsection states that the exception scheme is intended to prevent non-reimbursement for above-limit operating costs,

giving effect to this statement would require one to ignore the fact that subsequent regulatory provisions on exceptions direct HCFA to make adjustments to operating costs. *See* 47 Fed. Reg. 43291, 43293; 42 C.F.R. §§ 43289, 43293.

Most importantly, the quoted "general process" language from the preamble mentions only exceptions and exemptions; any reference to adjustments is conspicuously absent from the discussion of general process (despite the fact that the heading of the section reads "Exemptions, Exceptions, and Adjustments"). The omission of "adjustment" from the language in the subsection suggests that only exceptions are applied "to take costs into account that would otherwise be disallowed by application of the ceiling." Like the later subsections on exceptions, every discussion of "adjustments" in the preamble refers to adjustments made to operating costs, and not the TEFRA limit. *See* 47 Fed. Reg. 43282, 43289, 43291, 43293 (Sept. 30, 1982). Hence, even if the "general process" language precludes an incentive payment based on a below-limit adjusted CPD to a provider that qualifies for an *exception,* every indication in the text of the regulations suggests that such a restriction should not be placed on the adjustment process.

The above combination of factors leads us to conclude that the Secretary's interpretation as arbitrary and capricious. First, the language in the regulations and preamble to the regulations provides substantial evidence to challenge the Secretary's belief that incentive payments should not be applied to adjustments. *See Dickinson v. Zurko,* 527 U.S. 150, 150, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (holding that an agency's interpretation of its own regulations must be overturned if it is unsupported by substantial evidence); *Lodi Comm. Hosp. v. Shalala,* 94 F.3d 1251, 1252 (9th Cir.1996) (same). Such

evidence includes the facts that (1) except for the "general process" discussion of exceptions, every description of the exception and adjustment process in the regulations and preamble directs HCFA to adjust costs and not limits; (2) the general process discussion does not apply to *adjustments;* and (3) the discussion of "adjustments" in the § 405.460 preamble indicates that at the time of the adoption of the 1983 regulation, HCFA was revising its procedure to allow the amount of a hospital's total cost limit under an exception to be set at a level recognizing the full amount of justified costs for the purpose of qualifying for the incentive payment. It bears emphasis that this last discussion explicitly provides that incentive payments should be made to adjusted CPDs that fall below the TEFRA threshold. *See* 48 Fed. Reg. 39412, 39416 (Aug. 30, 1983).

Most significant is the fact that the Secretary's construction frustrates the underlying purpose of the TEFRA statute to reward efficient providers and penalize inefficient providers. The Secretary's decision to deny incentive payments to providers that have successfully contained their costs, but whose CPDs reflect distortions due to factors for which the hospital should not be held responsible, frustrates the policy Congress intended to advance through TEFRA. *See Anaheim Mem'l Hosp. v. Shalala,* 130 F.3d 845, 849 (9th Cir.1997) (reiterating the rule that deference is not owed to an agency construction of a statute that is contrary to congressional intent or frustrates congressional policy); *Trustees of the California State Univ. v. Riley,* 74 F.3d 960, 963 (9th Cir.1996). Although a district court in a foreign circuit has come to the opposite conclusion on this issue, *see Mercy Hosp. v. Shalala,* 823 F.Supp. 1, 4 (D.D.C.1993), we do not agree that "[a]llowing hospitals to absorb cost increases that do not result in losses is

consistent with the TEFRA incentive scheme."

Because the Secretary's action contravenes congressional policy and is unsupported by substantial evidence from the relevant regulations, her construction is not owed the deference normally granted to an agency under *Chevron.* We therefore reverse the district court's grant of summary judgment and remand for further consideration consistent with this opinion.

REVERSED and REMANDED.