**Burhan AKHTAR; Rechy Monzon Sese; Emerson Angeles, Plaintiffs–Appellants,**

v.

**James J. BURZYNSKI, Director of the Missouri Service Center of the I & NS; Immigration and Naturalization Service; James Opinion Ziglar, Commissioner of the I & NS; John Ashcroft, Attorney General, Defendants–Appellees.**

No. 02–57037.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 2004.

Filed Oct. 5, 2004.

---

Robert J. Dupont, Robert L. Reeves & Associates, Pasadena, CA, for the plaintiffs-appellants.

Debra W. Yang, United States Attorney, Los Angeles, CA; Leon W. Weidman, Assistant United States Attorney, Chief, Civil Division, Los Angeles, CA; Katherine M. Hikida, Assistant United States Attorney, Los Angeles, CA, for the defendants-appellees.

Before: BROWNING, REINHARDT, and WARDLAW, Circuit Judges.

JAMES R. BROWNING, Senior Circuit Judge:

Rechy Monzon Sese and Emerson Angeles [1] appeal the district court's grant of summary judgment in favor of the Appellees.[2] Both are natives and citizens of the Philippines, and children of lawful permanent residents of the United States. Their parents filed petitions on their behalf to obtain permanent resident status. While they awaited visa processing, Sese and Angeles were granted V nonimmigrant visas that allowed them to reunite with their families in this country. Those visas were terminated shortly after they received them, on the day before their 21st birthdays. They now challenge the "age-out" provisions of the regulations promulgated by the INS, arguing that the provisions are contrary to Congress's intent in enacting the underlying statute.

---

1. Subsequent to the filing of the appeal, the third original Plaintiff–Appellant, Burhan Akhtar, received permanent resident status. Thus, his claim is no longer before us.

2. The INS was abolished by the Homeland Security Act of 2002, 6 U.S.C. § 291. Appellees will be referred to as the "government."

We reverse the District Court's grant of summary judgment, and remand for further consideration.

## I

### A. Statutory and Regulatory Background

United States citizens and lawful permanent residents may file a visa petition on behalf of immediate relatives to obtain lawful permanent residency in the United States. The worldwide level of family-sponsored immigrants is limited to 480,000 per fiscal year. 8 U.S.C. § 1151(c)(1)(A). Immediate relatives of United States citizens may immigrate to the United States without regard to any quota system or waiting period. 8 U.S.C. § 1151(b)(2)(A)(i). For the remainder of family-sponsored immigrants, Congress has established a series of preference categories. Relatives of lawful permanent residents are divided into two subsections: "2A" for spouses and children; and "2B" for unmarried sons and daughters. 8 U.S.C. § 1153(a)(2). If a child[3] within category 2A turns 21 before a visa number becomes available, then he or she is transferred to the 2B waiting list. See 8 C.F.R. § 204.2(i)(2).

In December 2000, the 106th Congress passed the Legal Immigration Family Equity Act ("LIFE Act"). The LIFE Act added 8 U.S.C. § 1101(a)(15)(V), which grants spouses and children what is known as a V Visa allowing them to enter the country while they await a permanent visa number. See 8 U.S.C. § 1101(a)(15)(V) (granting the temporary visa to "an alien who is the beneficiary (including a child of the principal alien, if eligible to receive a visa under section 1153(d) of this title) of a petition to accord a status under section 1153(a)(2)(A) of this title"); see also 8

U.S.C. § 1153(a)(2)(A) (defining as qualified immigrants those "who are the spouses or children of an alien lawfully admitted for permanent residence"). To apply for a V Visa, an individual must have been waiting for permanent resident status for at least three years. See 8 U.S.C. § 1101(a)(15)(V). Once in the United States, V Visa recipients are entitled to a number of benefits, including employment authorization. See 8 U.S.C. § 1184(q)(1)(A).

On April 16, 2001, the Department of State issued interim regulations permitting consular officers to begin issuing V Visas. See Visas: Nonimmigrant Classes; Legal Immigration Family Equity Act Nonimmigrants, V and K Classification, 66 Fed. Reg. 19390–01 (interim rule Apr. 16, 2001). According to the regulations, a spouse who qualifies for "V" status is classified as "V–1," a petitioned-for child as "V–2," and a derivative child of either as "V–3." Id. Regarding whether those initially eligible for V Visas who had since turned 21 years of age would receive a V Visa, the interim regulations stated: "No. The V Visa classification clearly limits the class of qualifying aliens to beneficiaries of the F[amily]2A immigrant visa preference. . . . [T]he law only authorizes the issuance of visas to children who meet the INA definition of child. This rule reflects that limitation." Id. The Department stated that it would "issue visas to qualified applicants for the usual maximum full validity period of ten years, subject to issuance for a shorter period due to the possibility of age-out . . . ." Id.

The INS published its interim regulations on September 7, 2001. On the issue of "aging-out," the regulations state: "An alien admitted to the United States in V–2

---

3. The term "child" means an unmarried person under the age of 21. 8 U.S.C. § 1101(b)(1).

or V–3 nonimmigrant status (or whose status in the United States is changed to V–2 or V–3) will be granted a period of admission not to exceed 2 years or the day before the alien's 21st birthday, whichever comes first." 8 C.F.R. § 214.15(g)(2). Under the INS regulations, those who "remain eligible for V nonimmigrant status" (i.e., children under 21) may file a Form I–539 request for extension of the two-year period. 8 C.F.R. § 214.15(g)(3). Likewise, employment authorization will only be granted to those who remain eligible for V Visa status. 8 C.F.R. § 214.15(h).

## B. Factual Background

Sese's mother, Renato Sese, became a lawful permanent resident of the United States when he was a child. On October 8, 1996, when Sese was 16 years old, his mother filed an I–130 visa petition on his behalf. After nearly five more years of being separated from his mother, Sese was issued a V–2 visa and entered the United States on July 14, 2001. The INS authorized him to remain for just over ten weeks until September 25, 2001, the day before his 21st birthday. Sese remained in the United States with his family beyond that date.

Angeles's mother, Efren Angeles, also obtained permanent resident status when Angeles was a child. She petitioned for permanent resident status on his behalf on May 8, 1997, when Angeles was 16 years old. After waiting more than four years, Angeles's V–2 visa was approved. He entered the United States on August 14, 2001, one day before his 21st birthday. Even though the INS inspector admitted Angeles until August 13, 2003, the government asserts that the inspector's actions were made in error, and that Angeles should only have been admitted until Au-

gust 14, 2001, the same day he arrived in the United States.

After entering the United States, both Sese and Angeles applied for work authorization permits. The INS denied their applications on the basis that they had reached the age of 21. The government asserts that Sese and Angeles have overstayed their authorized period of admission, and that if they filed a Form I–539 application for extension, it would be denied.

On March 7, 2002, Sese and Angeles sought declaratory judgment and injunctive relief compelling the INS to approve their employment authorization applications, extend the term of their V Visas, and allow them to remain in the United States while they awaited approval of their visa petitions. On October 21, 2002, the district court granted the government's motion for summary judgment. The court held that the INS regulations "are not contrary to either the language of the statute or the legislative purpose as evidenced by the Congressional Record." Appellants also raised a Fifth Amendment due process claim, but the court held that summary judgment was appropriate for the government on this claim as well, a ruling they did not appeal.

Sese and Angeles do not dispute that only individuals in category 2A are eligible to receive V Visas. They argue that if an individual is issued a V–2 visa, the visa should not be revoked when he reaches 21, but rather he should be allowed to remain in the United States until he receives his visa number. They contend that by reseparating families originally reunited under the LIFE Act, the age-out provisions in 8 C.F.R. § 214.15(g)[4] are contrary to the congressional intent underlying the Act.

---

4. The Appellants also mention 8 C.F.R. § 214.15(h) and (j), but (g) is the only one of the three that specifically deals with aging-

out. As such, we consider their challenge to relate solely to subsection (g).

The government concedes that the LIFE Act was an ameliorative statute intended to reunite families until the petitioning family members receive their visa numbers. Nevertheless, it argues that because V Visas are available only to individuals who meet the requirements of preference category 2A, to grant work authorization or other benefits to V–2 visa holders who have reached the age of 21 would go beyond the statute's explicit authorization. It also argues that 8 C.F.R. § 214.15(g) is consistent with the language, legislative history, and underlying purpose of the statute, and is therefore entitled to deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

## II

### A. Standard of Review

In reviewing the INS regulations relating to V Visas, we apply the test set forth in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron*, we first ask whether Congress has directly spoken to the precise question at issue. *See id.* at 842, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, however, the statute is silent or ambiguous with respect to the specific issue, we must ask whether the regulations promulgated by the agency are based on a permissible construction of the statute. *See id.* at 843, 104 S.Ct. 2778. If so, we must defer to the agency. *See Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). We do not owe deference, however, to agency regulations if they construe a statute in a way that is contrary to congressional intent or that frustrates congressional policy. *See id.; CHW W. Bay v. Thompson*, 246 F.3d 1218, 1223 (9th Cir.2001). This is a question of law, which we consider de novo. *Id.*

Because Sese and Angeles make a facial challenge to 8 C.F.R. § 214.15(g), they must establish that no set of circumstances exists under which the regulation would be valid. *Reno v. Flores*, 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

### B. Chevron Step One

We begin by analyzing the language of the statute. *Navajo Nation v. Dep't of Health & Human Servs.*, 325 F.3d 1133, 1136 (9th Cir.2003) (en banc) (citing *Duncan v. Walker*, 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)). To be eligible to receive a V Visa, one must be "an alien who is the beneficiary ... of a petition to accord a status under section 1153(a)(2)(A)." 8 U.S.C. 1101(a)(15)(V). Section 1153(a)(2)(A) refers to the spouses and children of lawful permanent residents. Thus, under the statute, only those individuals within preference category 2A are eligible to receive a V Visa. It is clear that once a child reaches the age of 21, he or she is no longer eligible to *receive* a V–2 visa.

However, the statute is silent regarding whether an individual over the age of 21 is able to *hold* a V–2 visa. It is unclear whether "is the beneficiary" refers to an individual's eligibility to continue receiving the benefits of a V–2 visa he or she already holds, or to an individual's eligibility to be issued a V–2 visa in the first place. Thus, it is unclear whether the statute requires that V–2 visa recipients automatically lose their visas when they no longer fall within the definition of preference category 2A.

The LIFE Act also provides that the Attorney General shall grant employment authorization to a "nonimmigrant de-

scribed in section 1101(a)(15)(V) ... during the period of authorized admission." 8 U.S.C. § 1184(q)(1). However, because section 1101(a)(15)(V) is ambiguous, and "the period of authorized admission" is not defined further within section 1184(q)(1), it is not evident from the text of the statute whether employment authorization was intended for V–2 visa holders who have turned 21.

Thus, the statutory language of the LIFE Act is open to two interpretations: (1) V–2 visa holders do not lose the benefits of V Visa status upon turning 21 years of age; or (2) V–2 visa holders age-out of V Visa status at age 21. The statute does not favor one interpretation over the other. We must therefore determine whether the INS based its regulations on a permissible construction of the LIFE Act. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

## C. *Chevron* Step Two

■ To determine the congressional intent underlying the LIFE Act, " 'we look to the statute's language, structure, subject matter, context, and history—factors that typically help courts determine a statute's objectives and thereby illuminate its text.' " *Pac. Gas & Elec. Co. v. California ex rel. California Dept. of Toxic Substances Control,* 350 F.3d 932, 943 (9th Cir.2003) (quoting *Almendarez–Torres v. United States,* 523 U.S. 224, 228, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)).

### 1. *Language, Structure, and Subject Matter*

■ The LIFE Act mentions three circumstances in which V Visa status will terminate:

[T]he period of authorized admission ... shall terminate 30 days after the date on which any of the following is denied:

(i) The petition filed under section 1154 of this title to accord the alien a status under section 1153(a)(2)(A) of this title (or, in the case of a child

granted nonimmigrant status based on eligibility to receive a visa under section 1153(d) of this title, the petition filed to accord the child's parent a status under section 1153(a)(2)(A) of this title).

(ii) The alien's application for an immigrant visa pursuant to the approval of such petition.

(iii) The alien's application for adjustment of status under section 1255 of this title pursuant to the approval of such petition.

8 U.S.C. § 1184(q)(1)(B); *see also* H.R.Rep. No. 106–1048 (2001). Aging-out is not one of the ways V Visa status may be terminated. Construing the meaning of the statute in accordance with the canon of statutory construction *expressio uniusest exclusio alterius,* there is "a presumption that when a statute designates certain ... manners of operation, all omissions should be understood as exclusions." *Boudette v. Barnette,* 923 F.2d 754, 757 (9th Cir.1991). Since Congress explicitly enumerated circumstances by which V Visa benefits are terminated, the presumption is that Congress purposely excluded all other possible means, such as aging-out.

■ Of course, "canons [of statutory construction] are not mandatory rules. They are guides that need not be conclusive." *Chickasaw Nation v. United States,* 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (internal quotations and citations omitted). However, there is additional evidence supporting this interpretation in the congressional record of another LIFE Act provision, 8 U.S.C. § 1255(i). *See* Pub.L. No. 106–553, 114 Stat. (2000) (repealed and replaced in part by Pub.L. No. 106–554, 114 Stat. 2763). Under section 1255(i), any immigrant who is eligible for a visa, and for whom a visa is now available, can adjust to permanent resident status in the United States rather than

having to return abroad for consular processing.[5] *Id.* Explaining the provision, Senator Kennedy stated that "[s]pouses, children, parents and siblings of permanent residents or U.S. citizens will now be able to adjust their status in the U.S. and avoid needless separation from their loved ones," 146 Cong. Rec. S11850–02 (daily ed. Dec. 15, 2000) (statement of Sen. Kennedy), and Congressman John Conyers, Jr., commented that "[t]his would let all immigrants who have a legal right to seek permanent resident status to stay in this country with their families while they await a decision." 146 Cong. Rec. H12442–03 (daily ed. Dec. 15, 2000) (statement of Rep. Conyers, Jr.). While this provision is not directly at issue here, its inclusion within the same Act demonstrates Congress's intent to prevent immigrants who are lawfully in this country from being forced to leave their families, homes, and jobs to have their visa petitions processed.

 The government concedes that the LIFE Act was an ameliorative statute designed to reunite families of immigrants petitioning for permanent residency until the petitioner's visa number comes up. In determining congressional intent, we should adhere to " 'the general rule of construction that when the legislature enacts an ameliorative rule designed to forestall harsh results, the rule will be interpreted and applied in an ameliorative fashion.' " *Hernandez v. Ashcroft,* 345 F.3d 824, 840 (9th Cir.2003) (internal quotation mark omitted) (quoting *United States v. Sanchez–Guzman,* 744 F.Supp. 997, 1002 (E.D.Wash.1990)). This rule applies with additional force in the immigration context, "where doubts are to be resolved in favor of the alien." *Id.* (internal quotation mark omitted).

### 2. *Legislative History and Context*

Because the LIFE Act and its amendments were developed outside the usual Senate committee process, they were not accompanied by committee reports explaining their background and purpose. However, the congressional record includes a Joint Memorandum Concerning the Legal Immigration Family Equity Act of 2000 published on December 15, 2000, by the Chairman and the Ranking Member of the Subcommittee on Immigration, Senators Spencer Abraham and Edward M. Kennedy. It states in part:

> [The LIFE Act] sought to provide a new mechanism to address the problem created by the long backlog of immigrant visa applications for spouses and minor children of lawful permanent residents, who are currently having to wait many years for a visa to become available to them....
>
> The LIFE Act creates a new temporary "V" visa under which these spouses (and their children) can come to the United States and wait for their visa here, if their immigrant petitions have been pending for more than three years.... The purpose of the "V" and "K" visas is to provide a speedy mechanism by which family members may be reunited.

146 Cong. Rec. S11850–02 (daily ed. Dec. 15, 2000) (statement of Sen. Kennedy). Within the House of Representatives, the LIFE Act was discussed in a House Report on the Activities of the Committee on the Judiciary:

> There are more than one million spouses and minor children of permanent resident aliens who are on a waiting list for the limited number of immigrant visas available to them each year. Currently,

---

5. This provision is limited to individuals who are already in the country. *See* H.R.Rep. No. 106–1048, at 171 (2001).

they must wait for up to six years for visas to become available, making them endure long separations from their loved ones (as they generally cannot visit the United States while on the waiting list).

The LIFE Act creates a new nonimmigrant "V" visa for such spouses and children who have waited at least three years for their immigrant visas that they can continue their wait while living in the United States with their husbands or wives and their parents.

H.R.Rep. No. 106–1048, at 171 (2001).

The members of Congress who spoke in support of the LIFE Act reinforced the reports by echoing the emphasis on family reunification. For example, one of the Act's chief proponents, Senator Orrin Hatch, stated:

> Our proposal has as its foundation a simple goal—to take a much needed step toward bringing fairness to our Nation's immigration policy by reuniting families and helping those who have played by the rules. ... Our plan puts our Nation's resources behind reuniting families.... Eligible applicants would be allowed to reunite with their families residing in the United States, and work legally while awaiting a decision on the merits of their petitions.

146 Cong. Rec. S11263–01 (daily ed. Oct. 27, 2000) (statement of Sen. Hatch); *see also* 146 Cong. Rec. S11417–03 (daily ed. Oct. 31, 2000) (statement of Sen. Thurmond) ("[The LIFE Act] would assist hundreds of thousands of applicants who are on a waiting list to be united with their families in the United States. This bill would greatly help promote family unification."). Indeed, the LIFE Act was signed into law under the heading "Encouraging Immigrant Family Reunification." *See* Pub.L. No. 106–553 (2000).

The LIFE Act's legislative history provides affirmative evidence that Congress did not intend the statute to reseparate families after fulfilling its acknowledged purpose of reuniting them. The House report states that V Visa recipients could "continue their wait while living in the United States with their husbands or wives and their parents." H.R.Rep. No. 106–1048, at 171 (2001). In the Senate, it was said that such petitioners could "wait for their visa here," 146 Cong. Rec. S11850–02 (daily ed. Dec. 15, 2000) (Joint Memorandum), "while awaiting a decision on the merits of their petitions." 146 Cong. Rec. S11263–01 (daily ed. Oct. 27, 2000) (statement of Senator Hatch). At no time did a member of Congress qualify those pronouncements by indicating that the benefits could be automatically terminated by an individual's age.

The LIFE Act's legislative history at no time suggests that children of permanent residents who were issued a V–2 visa would have that visa terminated and be returned to their home country because of age. There is also no discussion of denying benefits such as work authorization on the basis of age. Rather, the legislative history plainly evinces Congress's knowledge that the immigrants affected by the Act were on track to receive permanent resident status, and that long administrative backlog was keeping thousands of families from being together in this country. Therefore, Congress decided to ameliorate the harshness of the lengthy application process for permanent residency and allow families to be together until the petitioners had permanent residency status.[6]

The government argues that the statute was intended to benefit V–2 visa petition-

---

**6.** The government conceded that this was Congress's intent in its brief and at oral argument.

ers only until they attained the age of 21. In support, the government points to the phrase "minor children" within the Senate Joint Memorandum and the House Report. 146 Cong. Rec. S11850–02 (daily ed. Dec. 15, 2000) ("The LIFE Act sought to provide a new mechanism to address the problem created by the long backlog of immigrant visa applications for spouses and minor children....."); H.R.Rep. No. 106–1048, at 171 (2001) ("There are more than one million spouses and minor children...."). It contends that this demonstrates that Congress did not intend to confer benefits on V–2 visa holders over the age of 21. Even in isolation, however, these sections of the statute can be read to address the question of initial eligibility just as easily as they can be read to address the question of continuing eligibility. They suffer from the same ambiguity as the statute itself, and are thus unhelpful in determining congressional intent. Moreover, the government fails to explain how its interpretation of "minor children"— which would require that V–2 visa holders be separated from their families at age 21—can be reconciled with the rest of the legislative history confirming Congress's primary purpose of family reunification.

### III

■ The average waiting period for family-sponsored immigrants is six years. H.R.Rep. No. 106–1048, at 171 (2001). Because an individual must have already been waiting for three years to become eligible for a V Visa, 8 U.S.C. § 1101(a)(15)(V), those petitioners affected by the age-out provisions of 8 C.F.R. § 214.15(g) include many individuals who have been in the United States for up to three years. During that time, they go to school, work, and develop ties to the United States that, once their visa number comes up, will become permanent. Congress was well-aware of these realities of the permanent residency petitioning pro-

cess. See H.R.Rep. No. 106–1048, at 171 (2001) ("Currently,[petitioners for permanent residency] must wait for up to six years for visas to become available...."). In response to the burdens placed on these families, Congress passed an ameliorative statute designed to bring immigrant families together throughout the permanent residency petitioning process. Yet the INS interpreted Congress's intent to be to reunite families, and allow petitioners to establish ties in this country while waiting for their visas, only to then revoke those visas and once again separate the petitioners from their families. The government's interpretation is particularly illogical when we consider the absence of evidence that Congress intended LIFE Act benefits to be time-limited, and when we recognize that part of the same Act explicitly allows petitioners for permanent resident status to stay in this country while they await their visa processing.

In short, the age-out provisions of 8 C.F.R. § 214.15(g), as interpreted by the INS, are contrary to congressional intent and frustrate congressional policy. *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *CHW W. Bay v. Thompson,* 246 F.3d 1218, 1223 (9th Cir.2001). Thus, the INS's construction is not owed the deference normally granted under *Chevron. See id.* We therefore invalidate the age-out provisions of 8 C.F.R. § 214.15(g), and reverse and remand for further consideration consistent with this opinion.

REVERSED and REMANDED.